In the

# United States Court of Appeals
## for the Eleventh Circuit

NetChoice,

*Plaintiff-Appellee,*

v.

Attorney General, State of Georgia,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Northern District of Georgia, Atlanta Division.
No. 1:25-cv-02422 — Amy Totenberg, *Judge*

## BRIEF OF ATTORNEY GENERAL

Logan B. Winkles
  *Deputy Attorney General*
Riley B. Liu
  *Assistant Attorney General*

Christopher M. Carr
  *Attorney General of Georgia*
Stephen J. Petrany
  *Solicitor General*
Elijah J. O'Kelley
  *Deputy Solicitor General*

Office of the Georgia
  Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(470) 816-1342
eokelley@law.ga.gov

*Counsel for Defendant-Appellant*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

I hereby certify that the following persons and entities may have an interest in the outcome of this case:

Carr, Christopher, Defendant-Appellant;

Denmark, Shannon, Counsel for Plaintiff-Appellee;

Lehotsky, Steven, Counsel for Plaintiff-Appellee;

Keller, Scott, Counsel for Plaintiff-Appellee;

Lehotsky Keller Cohn, LLP, Counsel for Plaintiff-Appellee;

Liu, Riley, Counsel for Defendant-Appellant;

Magnuson, Jared, Counsel for Plaintiff-Appellee;

Maltz, Jeremy, Counsel for Plaintiff-Appellee;

Morrow, Joshua, Counsel for Plaintiff-Appellee;

NetChoice, LLC, Plaintiff-Appellee;

O'Kelley, Elijah J., Counsel for Defendant-Appellant;

Petrany, Stephen J., Counsel for Defendant-Appellant;

Totenberg, Amy, Senior Judge, United States District Court for the Northern District of Georgia;

Winkles, Logan, Counsel for Defendant-Appellant.

/s/ *Elijah J. O'Kelley*
Elijah J. O'Kelley

# STATEMENT REGARDING ORAL ARGUMENT

The Attorney General requests oral argument in this case. Georgia passed legislation to help parents protect the wellbeing of their children through a minimally burdensome law that regulates how children can enter contracts with international corporations. The district court misunderstood the nature of the supposed free speech rights at issue, leading it to make errors as to standing and the merits. The issues are of profound importance and the decisional process would be aided by oral argument.

# TABLE OF CONTENTS

**Page**

Statement Regarding Oral Argument................................................ i

Table of Authorities ................................................................... iv

Jurisdiction ............................................................................... xi

Statement of Issues .................................................................... 1

Introduction .............................................................................. 3

Statement of the Case................................................................. 7

    A. Background ....................................................................... 7

        1. Social media platforms harm children............................ 7

        2. Georgia enacts SB 351 to protect children. ................. 10

    B. Proceedings Below................................................................ 13

    C. Standard of Review ............................................................. 15

Summary of Argument ................................................................ 15

Argument .................................................................................. 21

    I. NetChoice lacks standing.................................................... 21

        A. NetChoice cannot rely on the purported rights of its
members. ....................................................................... 22

        B. NetChoice cannot rely on third-party standing and the
purported rights of its members' users. ......................... 26

    II. NetChoice is unlikely to succeed on the merits of its claims.
....................................................................................... 31

A. SB 351's age verification and parental consent provisions do not trigger, much less violate the First Amendment. .................................................................. 32

   1. The age verification and parental consent provisions regulate minors contracting with corporations to access locations, not speech. .................................... 32

   2. At most, the age verification and parental consent provisions are content-neutral regulations with an incidental effect on speech and they satisfy intermediate scrutiny. ............................................. 38

B. SB 351's age verification provision is not unconstitutionally vague. ............................................... 51

C. SB 351's ad provision does not violate Section 230. ...... 53

D. NetChoice cannot succeed on any facial claim. ............ 55

III. NetChoice does not face irreparable harm and the equities weigh heavily against it. ..................................................... 59

Conclusion .................................................................................... 61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.B. v. Salesforce, Inc.,*
    123 F.4th 788 (5th Cir. 2024) .................................................. 54

*Almeida v. Amazon.com, Inc.,*
    456 F.3d 1316 (11th Cir. 2006) ............................................... 54

*Ayotte v. Planned Parenthood of N. New England,*
    546 U.S. 320 (2006) ................................................................. 50

*Barrows v. Jackson,*
    346 U.S. 249 (1953) ................................................................. 28

*Bochese v. Town of Ponce Inlet,*
    405 F.3d 964 (11th Cir. 2005) ................................................. 51

*Broadrick v. Oklahoma,*
    413 U.S. 601 (1973) ................................................................. 50

*Brown v. Ent. Merchs. Ass'n,*
    564 U.S. 786 (2011) ...........................................................36, 47

*M.H. ex rel. C.H. v. Omegle.com LLC,*
    122 F.4th 1266 (11th Cir. 2024) ............................................ 7, 9

*Caley v. Gulfstream Aerospace Corp.,*
    428 F.3d 1359 (11th Cir. 2005) ............................................... 33

*In re Checking Acct. Overdraft Litig. MDL No. 2036,*
    672 F.3d 1224 (11th Cir. 2012) ............................................... 33

*City of Austin, Texas v. Reagan Nat'l Advert. of Austin,*
    *LLC,*
    596 U.S. 61 (2022) .....................................................6, 18, 38–40

*City of S. Miami v. Governor of Fla.*,
  65 F.4th 631 (11th Cir. 2023) ..................................................... 22

*Club Madonna, Inc. v. City of Miami Beach*,
  924 F.3d 1370 (11th Cir. 2019) ................................................. 26

*Comput. & Commc'ns Indus. Ass'n v. Uthmeier*,
  No. 4:24CV438-MW/MAF, 2025 WL 1570007 (N.D.
  Fla. June 3, 2025) ....................................................................... 31

*Cox-Ott v. Barnes & Thornburg, LLP*,
  915 S.E.2d 894 (Ga. 2025) ......................................................... 52

*Curling v. Raffensperger*,
  50 F.4th 1114 (11th Cir. 2022) ................................................. 15

*Doe v. MySpace, Inc.*,
  528 F.3d 413 (5th Cir. 2008) ..................................................... 54

*Dream Defs. v. Gov. of the State of Fla.*,
  57 F.4th 879 (11th Cir. 2023) ................................................... 15

*Free Speech Coal., Inc. v. Att'y Gen.*,
  974 F.3d 408 (3d Cir. 2020)
  ............................................................................ 4, 16, 17, 22–25

*\*Free Speech Coal., Inc. v. Paxton*,
  145 S. Ct. 2291 (2025)
  ...................................1, 4–7, 16, 18–20, 23, 26, 32, 43–46, 48, 57

*Free Speech Coal., Inc. v. Paxton*,
  95 F.4th 263 (5th Cir. 2024) ..................................................... 54

*Fuld v. Pal. Liberation Org.*,
  606 U.S. 1 (2025) ....................................................................... 52

*Ga. Cemetery Ass'n v. Cox*,
  353 F.3d 1319 (11th Cir. 2003) ..................................5, 16, 22, 25

*Gary v. City of Warner Robins,*
    311 F.3d 1334 (11th Cir. 2002) .....................................34, 35, 37

*Granite State Outdoor Advert., Inc. v. City of St. Petersburg, Fla.,*
    348 F.3d 1278 (11th Cir. 2003) .................................................. 38

*Harris v. Evans,*
    20 F.3d 1118 (1994) (en banc) .......................................17, 26–29

*Harris v. McRae,*
    448 U.S. 297 (1980) ................................................................. 23

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) .............................................................16, 22

*Indigo Room, Inc. v. City of Fort Myers,*
    710 F.3d 1294 (11th Cir. 2013) .........................5, 6, 18, 34, 35, 37

*Leathers v. Medlock,*
    499 U.S. 439 (1991) ....................................................6, 18, 41, 42

*Maryland v. King,*
    567 U.S. 1301 (2012) ............................................................... 61

*Mata Chorwadi, Inc. v. City of Boynton Beach,*
    66 F.4th 1259 (11th Cir. 2023) ......................................26, 30, 31

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024)
    ........................................................ 4, 7, 20, 21, 25, 34, 43, 55–58

*Murthy v. Missouri,*
    603 U.S. 43 (2024) ................................................................... 21

*Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.,*
    896 F.2d 1283 (11th Cir. 1990) ................................................ 59

*Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell,*
467 F.3d 999 (6th Cir. 2006) .................................................... 29

*NetChoice, L.L.C. v. Fitch,*
134 F.4th 799 (5th Cir. 2025)
............................................................. 4, 19, 20, 49, 53, 57–59

*NetChoice, L.L.C. v. Fitch,*
No. 25-60348, 2025 WL 2078435 (5th Cir. July 17, 2025) ...................................................................... 59

*NetChoice, LLC v. Fitch,*
No. 25A97, 2025 WL 2350189 (U.S. Aug. 14, 2025) ........... 21, 59

*Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.,*
280 F.3d 278 (3d Cir. 2002) ..................................................... 29

*Powers v. Ohio,*
499 U.S. 400 (1991) ........................................................... 26, 31

*TikTok Inc. v. Garland,*
604 U.S. 56 (2025) ............................................................ 6, 41

*Turner Broad. Sys. v. FCC,*
512 U.S. 622 (1994) ........................................................... 42, 43

*United States v. Woodson,*
30 F.4th 1295 (11th Cir. 2022) ................................................... 9

*Virginia v. Am. Booksellers Ass'n,*
484 U.S. 383 (1988) ................................................................. 28

*Wacko's Too, Inc. v. City of Jacksonville,*
134 F.4th 1178 (11th Cir. 2025) ........................................... 49, 50

*Williams-Yulee v. Fla. Bar,*
575 U.S. 433 (2015) ................................................................. 43

*Wreal, LLC v. Amazon.com, Inc.*,
  840 F.3d 1244 (11th Cir. 2016) ..........................................21, 59, 60

*Young Apartments, Inc. v. Town of Jupiter, Fla.*,
  529 F.3d 1027 (11th Cir. 2008) ...........................................17, 28

**Statutes**

2024 Ga. Laws 298 ..................................................................3, 7, 11

8 U.S.C. § 1153 ........................................................................ 52

11 U.S.C. § 562 ........................................................................ 52

15 U.S.C. § 1681e ...............................................................19, 52

17 U.S.C. § 115 ........................................................................ 52

31 U.S.C. § 5318 ...................................................................... 52

42 U.S.C. § 2000e .................................................................... 52

42 U.S.C. § 12112 .................................................................... 52

47 U.S.C. § 201 ........................................................................ 52

47 U.S.C. § 230 ...................................................................19, 53

O.C.G.A. § 13-3-5 .................................................................... 33

O.C.G.A. § 13-3-20 .................................................................. 33

O.C.G.A. § 13-3-21 .................................................................. 33

O.C.G.A. § 13-3-24 .................................................................. 33

O.C.G.A. § 13-8-2 .................................................................... 33

O.C.G.A. § 39-6-1 .....................................................11, 33, 39, 41

O.C.G.A. § 39-6-2 ..........................................3, 12, 32, 44, 45, 48

O.C.G.A. § 39-6-3 ................................................................12, 20, 53

O.C.G.A. § 39-6-4 ...........................................................12, 13, 60

**Other Authorities**

Adult Content, X (May 2024),
    https://tinyurl.com/5e5abp2b ............................................... 5, 57

Angela Yang, *Mark Zuckerberg apologizes to parents at
    online child safety hearing*, NBC News (Jan. 31,
    2024), https://tinyurl.com/486m42n5 ......................................... 9

Bobby Allyn, *Here are 4 key points from the Facebook
    whistleblower's testimony on Capitol Hill*, NPR (Oct.
    5, 2021), https://tinyurl.com/mte47c92 .................................... 10

Emile Marzolf & Eliza Gkritsi, *X, Bluesky and Reddit
    in France's crosshairs amid porn clampdown*,
    Politico (June 11, 2025),
    https://tinyurl.com/yhyxkdvb .................................................... 57

Federal Trade Comm'n, *A Look Behind the Screens:
    Examining the Data Practices of Social Media and
    Video Streaming Services*, (Sep. 2024),
    https://tinyurl.com/4cn98c6c .................................................... 33

Letter from Senators Richard Blumenthal and Marsha
    Blackburn, United States Senate, to Mark
    Zuckerberg, Founder, Chairman, & Chief Executive
    Officer of Meta, June 21, 2023,
    https://www.blumenthal.senate.gov/imo/media/doc/0
    6212023metainstagramcsamletter.pdf .................................... 10

Shannon Bond & Bobby Allyn, *Whistleblower Tells
    Congress that Facebook Products Harm Kids and
    Democracy*, NPR (Oct. 5, 2021),
    https://tinyurl.com/2ams3hvk .................................................... 10

Sue Halpern, *Instagram for Kids and What Facebook Knows About the Effects of Social Media*, New Yorker (Sep. 30, 2021), https://tinyurl.com/y3vrehyh .............. 10

# JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because NetChoice raised constitutional challenges and challenges under 42 U.S.C. § 1983.

This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1) because the district court granted a preliminary injunction prohibiting enforcement of portions of Senate Bill 351.

This appeal is timely because the district court granted the preliminary injunction on June 26, 2025, Doc. 34, and the Attorney General filed a notice of appeal on July 16, 2025, Doc. 35.

# STATEMENT OF ISSUES

1.     Whether NetChoice, a trade organization for internet companies, has standing to challenge Georgia's law requiring parental consent before children under the age of 16 contract with NetChoice's member companies, where NetChoice challenges the supposed burdens not on itself or even its members but its members' users?

2.     Whether Georgia's law requiring parental consent before minors enter contracts to access digital locations facially violates the First Amendment when it, if it regulates speech at all, only indirectly imposes "modest burdens," *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2317 (2025), on accessing speech?

3.     Whether allowing social media platforms to use "commercially reasonable efforts" to verify users' age is unconstitutionally vague, where the entire legal system and NetChoice's own members' contracts consist of reasonableness standards?

4.     Whether a law barring a social media platform from displaying advertisements to minors based on certain data about the minor is preempted by 47 U.S.C. § 230's provisions about holding platforms liable for third-party content?

5.     Whether preliminary injunctive relief is proper where the moving party waited over a year to file its lawsuit and where the equities to be balanced are minor compliance costs of internet giants weighed against the State's interest in safeguarding the safety and mental health of minors?

## INTRODUCTION

Social media is making kids less attentive, mentally ill, emotionally stunted, unable to sleep, more likely to attempt suicide, and vulnerable to sextortion and sexual predation. And none of it is a secret. Social media companies have known about those dangers while, in some instances, suppressing that information and still acting to exploit children. Those platforms, hiding behind their trade association NetChoice, seek a judicial veto over any regulation that protects children, on the theory that internet companies are immune from even minimally burdensome regulation because they happen to host speech on their platforms. The district court acquiesced in this gambit and this Court should reverse.

In 2024, the Georgia legislature passed a law requiring covered social media platforms—if they require users to create an account—to verify the age of the user and, if under the age of 16, to verify that the minor has parental consent to create the account. *See* 2024 Ga. Laws 298. The law allows social media platforms to use "commercially reasonable efforts" to do those things, O.C.G.A. § 39-6-2, ensuring that compliance is tailored to any given platform's capabilities. And compliance is not hard. There are "established methods" across various internet industries

for compliance, and those methods impose at most a "modest burden." *Paxton*, 145 S. Ct. at 2317, 2319.

NetChoice nevertheless sought and obtained a preliminary injunction against enforcement of the law, but this challenge should fail top to bottom. For one, NetChoice lacks standing. Associational standing is off the table because the "diversity of circumstances presented by [NetChoice's] membership" requires "individualized inquir[ies]" about both whether and how SB 351 applies to any given member. *Free Speech Coal., Inc. v. Att'y Gen.*, 974 F.3d 408, 422 (3d Cir. 2020). And NetChoice, a trade association for the regulated industry, cannot assert the rights of social media platform users, the people whom the challenged law protects *from* the regulated industry.

Either way, a facial challenge is certainly inappropriate. There is at least the need for "a factual analysis determining the commercially reasonable effort demanded of each individual" platform—an analysis the record simply doesn't allow for. *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 809 (5th Cir. 2025). And it's not as if the covered platforms are a monolith. Some potentially covered platforms are messaging-based applications, *see* Doc. 1 at 9–10, which may not engage in protected expression at all, *see Moody v. NetChoice, LLC*, 603 U.S. 707, 725–26 (2024).

Some covered platforms allow pornography, *see, e.g.*, Adult Content, X (May 2024), https://tinyurl.com/5e5abp2b, which changes the analysis as to them, *see Paxton*, 145 S. Ct. at 2317–18.

And in the vast majority of applications, SB 351 is constitutionally sound. It regulates the ability of minors to contract to access certain online locations. Little different than run-of-the-mill brick-and-mortar access restrictions, SB 351 is not transformed into a speech regulation just because locations happen to host speech. *See, e.g.*, *Indigo Room, Inc. v. City of Fort Myers*, 710 F.3d 1294, 1300 (11th Cir. 2013). At the very most, SB 351 is content-neutral and subject only to intermediate scrutiny, which it satisfies. "[R]equiring age verification online is plainly a legitimate legislative choice" and "well within the State's discretion." *Paxton*, 145 S. Ct. at 2317–18. Requiring parental consent for minors is no different.

The district court's contrary order is riddled with errors. On standing, for instance, it reasoned that associational standing is proper because NetChoice seeks facial relief, Doc. 34 at 12–13, even though this Court has required member participation even in facial challenges, *Ga. Cemetery Ass'n v. Cox*, 353 F.3d 1319, 1322 (11th Cir. 2003). Plus, the district court recognized that SB 351 may have "disparate application" by burdening different platforms

differently, Doc. 34 at 13, but somehow did not connect that to NetChoice's lack of associational standing, *see*, *e.g.*, *Free Speech Coal.*, 974 F.3d at 421–22.

On the merits, the district court repeatedly made holdings in the teeth of contrary precedent. It reasoned, for example, that SB 351 regulates speech by restricting access to social media platforms, Doc. 34 at 24, even though this Court has held that it's not a regulation of speech to restrict minors' access to locations hosting speech, *Indigo Room*, 710 F.3d at 1300. The district court reasoned that SB 351 is content-based because it requires "looking to … the posts" on websites, Doc. 34 at 23, even though the Supreme Court has held a law is not content-based just because it "requires reading the sign at issue," *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022). The district court reasoned that SB 351 must be content-based because it is in some instances speaker-based, Doc. 34 at 25–26, even though "a differential burden on speakers is insufficient by itself to raise First Amendment concerns," *Leathers v. Medlock*, 499 U.S. 439, 452 (1991); *accord TikTok Inc. v. Garland*, 604 U.S. 56, 72–73 (2025). It reasoned that SB 351 fails scrutiny because it imposes "enormous burdens" on speech, Doc. 34 at 28, even

though the Supreme Court held that age verification is only a "modest burden," *Paxton*, 145 S. Ct. at 2317.

These errors are the tip of the iceberg, and this Court should reverse.

## STATEMENT OF THE CASE

In 2024, Georgia enacted a law regulating the ability of minors to contract with corporations to access certain internet platforms. 2024 Ga. Laws 298. NetChoice filed a lawsuit a year later, challenging aspects of the law as unconstitutional and moving to preliminarily enjoin it. Doc. 1; Doc. 5. The district court granted the preliminary injunction. Doc. 34.

### A. Background

#### 1. Social media platforms harm children.

The "internet in general and social media in particular pose grave risks to children." *M.H. ex rel. C.H. v. Omegle.com LLC*, 122 F.4th 1266, 1268 (11th Cir. 2024). Those dangers are "unprecedented," of a kind "not seen earlier." *Moody*, 603 U.S. at 716, 733. Social media platforms combine various activities, including extremely dangerous activities carried about by dangerous actors, with a host of interactive features and endless scrolling mechanisms designed to keep people on the platforms

perpetually. Doc. 23-1 at 12. Unsurprisingly, the problems social media platforms pose to children's wellbeing are legion.

To start, social media platforms are a plague on children's mental health. They are, by explicit design, hyper-addictive. *Id.* at 12, 19. Nearly every teenager uses social media, more than a third report using it almost constantly, and on average teens spend around five hours a day on social media. *Id.* at 17. It shows. Thanks to social media, minors have increased rates of depression, anxiety, self-harm, and body-image problems. *Id.* at 12, 21. Youth suicide rates have increased. *Id.* at 22, 27. Young girls, in particular, are hard-hit by the constant status comparisons and incentive structure social media thrusts upon them, and it has resulted in increased instances of body dysmorphia. *Id.* at 30–32. Social media also harms teens' sleep patterns, which undermines their cognitive development, reduces minors' attention spans, and has resulted in worse academic performances. *Id.* at 12, 20, 23, 36–37. And of course, more time on screens means less time socializing in reality, which itself disrupts emotional and cognitive development. *Id.* at 17, 20, 28.

The dangers aren't restricted to mental illness. Bullying, intimidation, harassment, and sexual predation thrive on social media platforms. *E.g.*, *id.* at 13, 16, 20, 24–28. The platforms are

easy tools for sexual predators to use to "find and exploit their victims" in numerous ways. *M.H.*, 122 F.4th at 1268; *see also United States v. Woodson*, 30 F.4th 1295, 1299 (11th Cir. 2022) (predator used "a social media application called Snapchat"). One way is through what's commonly called "sextortion," where an adult predator poses as a child to trick minors into making child pornography and then uses it to blackmail the minor into making even more. *See, e.g. id.*; Doc. 23-1 at 24. And that is only one concern. Social media can and has been used to coordinate sex trafficking, Doc. 23-1 at 25, and to facilitate real life sexual crimes with victims targeted and approached on social media, *id.* at 25–26. The CEO of Meta (the parent company of Facebook and Instagram) apologized to parents of child victims during a Senate hearing.[1] And United States Senators have recognized "reports that Instagram has harbored an open-air market for the sale of child sexual abuse material and the trafficking of children," that Instagram was "fostering abuse networks," and that "Meta's own failures have made Instagram a safe haven for child abuse."[2]

---

[1] Angela Yang, *Mark Zuckerberg apologizes to parents at online child safety hearing*, NBC News (Jan. 31, 2024), https://tinyurl.com/486m42n5.

[2] Letter from Senators Richard Blumenthal and Marsha Blackburn, United States Senate, to Mark Zuckerberg, Founder,

Social media companies know about all those problems. But not only have they persisted in trying to keep kids addicted, *see* Doc. 23-1 at 12, they've actively tried to hide from the public the dangers and negative effects. One whistleblower, for example, testified to Congress that Meta had concealed internal research showing the addictive and harmful effect of platforms on children,[3] and leaked documents also showed Facebook's awareness of the prevalence of human traffickers.[4]

### 2. Georgia enacts SB 351 to protect children.

Parents have limited and generally insufficient tools to protect their children from the dangers of social media. Doc. 23-1 at 39–42. Recognizing that, and recognizing the dangers social media platforms pose to children, the Georgia General Assembly passed SB 351 to help parents protect children's wellbeing. The

---

Chairman, & Chief Executive Officer of Meta, June 21, 2023, https://www.blumenthal.senate.gov/imo/media/doc/06212023meta instagramcsamletter.pdf.

[3] Bobby Allyn, *Here are 4 key points from the Facebook whistleblower's testimony on Capitol Hill*, NPR (Oct. 5, 2021), https://tinyurl.com/mte47c92

[4] *E.g.*, Shannon Bond & Bobby Allyn, *Whistleblower Tells Congress that Facebook Products Harm Kids and Democracy*, NPR (Oct. 5, 2021), https://tinyurl.com/2ams3hvk; Sue Halpern, *Instagram for Kids and What Facebook Knows About the Effects of Social Media*, New Yorker (Sep. 30, 2021), https://tinyurl.com/y3vrehyh.

legislature passed the law in April 2024, setting its effective date as July 1, 2025. *See* 2024 Ga. Laws 298, 317.

SB 351 defines its scope through the definition of "social media platform," which is "an online forum that allows an account holder to create a profile, upload posts, view and listen to posts, form mutual connections, and interact publicly and privately with other account holders and users." O.C.G.A. § 39-6-1(6). Excluded from the definition is any "online service, website, or application where the predominant or exclusive function" is one of several things. *Id.* Those excluded functions range from email, to streaming services, to websites where content "is preselected by the provider," to online shopping, gaming, photograph editing, business-to-business software and teleconferencing and cloud storage, among other things. *Id.* at § 39-6-1(6)(A)–(V).

SB 351 generally establishes age requirements through an age verification provision and a parental consent provision. The age verification provision requires social media platforms to "make commercially reasonable efforts to verify the age of account holders with a level of certainty appropriate to the risks that arise from the social media platform's information management practices." O.C.G.A. § 39-6-2(a). The parental consent provision provides that, as to people under the age of 16, no "provider of a

social media platform shall permit a minor to be an account holder unless such provider obtains the express consent of such minor's parent or guardian." *Id.* § 39-6-2(b). It points to several "[a]cceptable methods of obtaining express consent," including a signable form, a toll-free telephone number, a videoconference, government identification or transaction data, and "[a]ny other commercially reasonable method of obtaining consent using available technology." *Id.* § 39-6-2(c)(1)–(6).

Separately, SB 351 requires that for minor account holders, social media platforms "shall prohibit" the "display of any advertising in the minor account holder's account based on such minor account holder's personal information, except age and location." O.C.G.A. § 39-6-3(1).

Enforcement of SB 351 is vested solely in Georgia's Attorney General. O.C.G.A. § 39-6-4(a)–(b). SB 351 also has a safe harbor. "At least 90 days before the day on which the Attorney General initiates an enforcement action," he must provide written notice identifying "each alleged violation and an explanation of the basis for each allegation." *Id.* § 39-6-4(d). That person then has at least 90 days from the notice to provide "a written statement indicating that the alleged violation is cured." *Id.*

## B. Proceedings Below

NetChoice is a "trade association for internet companies." Doc. 1 at 6. It sued to challenge SB 351 in May 2025—over a year after it was enacted—and, on the same day, filed a motion for preliminary injunction. Doc. 1; Doc. 5. It alleged that its members include companies like Meta (the owner of Facebook and Instagram), Snapchat, Reddit, X (formerly known as Twitter), and YouTube, and that those members, among some others, are regulated by SB 351. Doc. 1 at 7. It also alleged that not all of its members are regulated by the law. *Id.*

NetChoice asserted facial and as-applied challenges against various provisions of SB 351, largely under the First Amendment. *Id.* at 27. It claimed SB 351's definition of social media platform unconstitutionally infringes speech and is unconstitutionally vague. *Id.* at 29–40. It also claimed that the age verification, parental consent, and ad provisions violate the First Amendment (but not that they are unconstitutionally vague). *Id.* at 40–48. And it claimed separately that the ad provision is preempted by § 230 of the Communications Decency Act. *Id.* at 48–50. Based on those claims, NetChoice moved to preliminarily enjoin the enforcement of the challenged provisions against its members. Doc. 5 at 2.

The district court agreed. Doc. 34. It ruled that NetChoice has associational standing because its members "are 'social media platforms' regulated by SB 351," *id.* at 9, and that those members' participation is not required because NetChoice asserts a facial challenge, *id.* at 13. The court separately concluded that NetChoice could assert not just the rights of its members but also the rights of its members' users. *Id.* at 13–15. And it reasoned that a "facial challenge is the appropriate vehicle" because "the law's constitutionality hinges on the same analysis in each application." *Id.* at 19.

On the merits, the court concluded that SB 351's definition of "social media platform" is a content-based speech regulation because the exceptions require "looking to … the posts" on different websites and because the definition makes a "speaker-based" distinction between user-generated content and platform-generated content. *Id.* at 23, 25–26. The court then ruled that the age verification and parental consent provisions fail strict scrutiny because they place "enormous burdens" on speech, *id.* at 28, by potentially letting parents veto their children's access to platforms, *id.* at 28–29, and by possibly meaning "Georgians would have to submit government-issued identification," *id.* at 30. The court also believed the "commercially reasonable efforts"

standard "reveals fatal under-inclusiveness" because it would mean corporations of different sizes "would face different levels of rigor in verifying users' ages." *Id.* at 39–40. Separately, the court ruled that the age verification provision is unconstitutionally vague because of the "commercially reasonable efforts" standard. *Id.* at 43–44. The court also ruled that the ad provision is preempted by § 230. *Id.* at 44–45. And it concluded that NetChoice would face irreparable harm and that the equities weighed in its favor. *Id.* at 45–49.

## C. Standard of Review

This Court reviews "standing determinations *de novo*." *Dream Defs. v. Gov. of the State of Fla.*, 57 F.4th 879, 886 (11th Cir. 2023). It reviews the grant of a preliminary injunction for abuse of discretion but reviews *de novo* any underlying legal questions. *Curling v. Raffensperger*, 50 F.4th 1114, 1120–21 (11th Cir. 2022).

## SUMMARY OF ARGUMENT

NetChoice seeks to enjoin a law that imposes the minimal burden of age-verification, and it does this not to assert its own rights or even those of its members but the purported rights of its members' users. NetChoice has no standing here, and its

challenge fails on the merits as well. That NetChoice waited well over a *year* to file this suit proves that it fails on the equities, too.

**I.** NetChoice lacks standing for multiple reasons. Associational standing is unavailable when the participation of the association's members is required, *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977), which happens when claims require "fact-intensive-individual inquiry," *Free Speech Coal.*, 974 F.3d at 421 (quotation omitted). NetChoice's members range from mega-corporations to small businesses and from messaging-based platforms to platforms based on content-moderated feeds. Doc. 1 at 9–10. Individualized inquiries are required to assess at least whether SB 351 applies to each NetChoice member, and whether any burden is adequately tailored. *See Free Speech Coal.*, 974 F.3d at 421–22. The district court disregarded all of this because NetChoice pursues a facial challenge, Doc. 34 at 13, but facial relief does not resolve the associational standing problem, *Ga. Cemetery Ass'n*, 353 F.3d at 1322. And bizarrely, the district court thought member participation is not required because SB 351 may have "disparate application" to different members. Doc. 34 at 13. But that's exactly what requires their participation. *See Free Speech Coal.*, 974 F.3d at 421.

NetChoice also cannot assert the rights of its members' users. It cannot show either "a close relation to the third party" or that there is "some hindrance to the third party's ability" to sue. *Harris v. Evans*, 20 F.3d 1118, 1122 (1994) (en banc). NetChoice has no relationship with social media platform users at all (even if the platforms might). And NetChoice's interest is *adverse* to users' interests because it represents the very platforms SB 351 protects users from. As for hindrance, there is nothing making it "difficult if not impossible" for users to sue. *Young Apartments, Inc. v. Town of Jupiter, Fla.*, 529 F.3d 1027, 1043 (11th Cir. 2008) (quotation omitted). The district court did not even address these dispositive points.

**II.A.** The age verification and parental consent provisions do not facially violate the First Amendment. The provisions don't regulate speech at all. They are routine contracting and age-verification laws, applying only if a platform requires users to create an account, which invariably requires agreeing to terms of use. That is not transformed into a speech regulation just because the contracting parties engage in speech. This Court has held that a law regulating entry into a place serving alcohol was not a regulation of speech at all, even when the place was hosting a political event and the minor sought entrance solely to attend the

event. *Indigo Room*, 710 F.3d at 1299–1300. SB 351 is the same category of law, just in a digital space instead of a physical one.

Even if SB 351 incidentally affects speech, it should be subject only to intermediate scrutiny. SB 351 does not "discriminate based on the topic discussed or the idea or message expressed." *City of Austin*, 596 U.S. at 73–74 (quotation omitted). It is simply concerned with the online *locations* where children may be present. The district court's contrary conclusion was based on two foreclosed arguments: that enforcing SB 351 requires looking at posts on websites and that it makes speaker-based distinctions. But neither the need to look at content nor the simple presence of speaker-based distinctions make a law content-based. *See City of Austin*, 596 U.S. at 69; *Leathers*, 499 U.S. at 452.

SB 351 satisfies intermediate scrutiny because it is a narrowly tailored, minimally burdensome regulation that advances a compelling governmental interest. Georgia has an overwhelming interest in protecting children from the dangers of social media platforms, and the district court did not question that. SB 351 does not "burden substantially more speech than necessary to further those interests." *Paxton*, 145 S. Ct. at 2317 (quotation omitted). As the Supreme Court just held, "requiring age verification is plainly a legitimate legislative choice" that

satisfies intermediate scrutiny because it is only a "modest burden." *Id.* The same is true of the parental consent provision. *See* Doc. 23-2 at 21–22. The district court insisted that providing government identification is an "enormous burden," Doc. 34 at 28, but the Supreme Court has held that online age-verification is only a "modest burden," *Paxton*, 145 S. Ct. at 2317.

**II.B.** The district court *sua sponte* ruled that the age verification provision is unconstitutionally vague because of its "commercially reasonable efforts" language. Doc. 34 at 43–44. NetChoice *never* challenged that language as vague. *See* Doc. 1 at 38–40. Other courts have addressed it without any confusion. *See, e.g.*, *Fitch*, 134 F.4th at 809. And the court's premise that a reasonableness standard is *unconstitutional* would upend practically the entire legal system, as countless statutes depend on reasonableness language. *See, e.g.*, 15 U.S.C. § 1681e(a) (Fair Credit Reporting Act requiring "reasonable procedures" and "reasonable effort"). The statute is not vague.

**II.C.** SB 351's ad provision is not preempted by § 230. Section 230 is concerned with making platforms liable "as the publisher or speaker" of third-party content, 47 U.S.C. § 230(c)(1), but the ad provision governs the platforms' own conduct in displaying advertisements to minors, O.C.G.A. § 39-6-3(1). It does

not transform anyone into a publisher, except where they are in fact the publisher, a scenario § 230 does not touch.

**II.D.** If nothing else, facial relief is inappropriate, and the district court didn't even conduct a facial analysis. A facial analysis requires deciding whether a law's unconstitutional applications substantially outweigh the constitutional applications. *See Moody*, 603 U.S. at 724. For a law like SB 351, that means figuring out if an application like Snapchat, for example, is covered by the law at all and whether, being a messaging-based platform, it even engages in protected speech. *See id.* at 725–26 (suggesting transmitting messages is not expressive). It means accounting for differences across platforms, such as X and Reddit allowing pornography. *Cf. Paxton*, 145 S. Ct. at 2317–18. It requires assessing the distinct and "unique regulatory burden" that each platform will face, which requires "a factual analysis determining the commercially reasonable effort demanded of each individual" platform. *Fitch*, 134 F.4th at 809. The district court did *none* of that. It asserted with no further explanation that the constitutional analysis is the "same … in each application." Doc. 34 at 19. That assertion was unsupported and unsupportable, especially in the light of *Moody*.

**III.** The equities are overwhelmingly against NetChoice. The Supreme Court recently refused to vacate a stay of a preliminary injunction of Mississippi's similar law, *NetChoice, LLC v. Fitch*, No. 25A97, 2025 WL 2350189 (U.S. Aug. 14, 2025), and NetChoice's situation in Georgia is the same (or better) than in Mississippi. Anyway, NetChoice doesn't face irreparable harm: it waited over a year to file its lawsuit, and a delay of "even only a few months" is enough to "undermine[] a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). NetChoice's members face minor compliance costs (largely based on technology its members *already* have), where the State faces a broad injunction against its attempts to protect the safety and mental health of children under the age of 16. The equities are not a close call.

## ARGUMENT

### I. NetChoice lacks standing.

At the preliminary injunction stage, a plaintiff must make a clear showing that it likely has standing. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). Standing requires a plaintiff to "prove (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *City of S. Miami v. Governor of Fla.*, 65 F.4th 631, 636

(11th Cir. 2023) (quotation omitted). NetChoice cannot do that, so it asserts the rights of its members' users. Because NetChoice cannot rely on associational standing or third-party standing—much less fourth-party standing—it lacks standing.

## A. NetChoice cannot rely on the purported rights of its members.

An association plaintiff can assert standing only if it can show that at least one of its members would have standing in its own right, the interests the lawsuit seeks to protect are germane to the organization's purpose, and "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343.

Associational standing is "improper for claims requiring a fact-intensive-individual inquiry" because that requires member participation. *Free Speech Coal.*, 974 F.3d at 421 (quotation omitted). Where, for example, an association of cemeteries filed a facial challenge to a law setting a fee limit that would affect only some members, member participation was required "because the economic impact … will vary depending upon the economic circumstances of each of its members." *Ga Cemetery Ass'n*, 353 F.3d at 1322. Likewise, an association could not challenge restrictions on abortion funding because the claim turned on the

law's coercive effect on each member's religious beliefs, but the association's membership had diverse religious views about abortion. *See Harris v. McRae*, 448 U.S. 297, 321 (1980).

The same rule holds in the free speech context. For instance, where an association of pornographers challenged an age-verification law as a burden on their free speech rights, associational standing was inappropriate because the tailoring question (under both intermediate and strict scrutiny) required individualized inquiries about the burden on the speech of each member. *Free Speech Coal.*, 974 F.3d at 421–22. There was a "diversity of circumstances presented by [the association's] membership," and "what may be narrowly drawn and the least restrictive means for one association member will not necessarily be so for another." *Id.* at 422 (quotation omitted).

NetChoice cannot rely on associational standing here. Its membership is broad and diverse. It includes messaging-driven applications like Snapchat and neighborhood-focused platforms like NextDoor. Doc. 1 at 9–10. It includes some of the most massive corporations in the world like Meta, *id.* at 7, and a small, niche platform like Dreamwidth, *id.* at 9. Some of those members have already claimed to have existing technology and ability to verify users' age or obtain parental consent. *Id.* at 12–14. Meta,

for example, points to how it already has "teen accounts" (which requires some degree of age verification) and boasts that it requires parental consent to change certain settings on those accounts (which requires some degree of parental verification). *See, e.g.*, Doc. 5-4 at 16–18. It also claims it has "technology that allows it to estimate people's ages to determine" if the person "is younger or older than 18," *id.* at 18, which is a viable age-verification method under SB 351, *see* Doc. 23-2 at 8–11.

The "diversity of circumstances presented by [NetChoice's] membership" defeats its claim of associational standing. *Free Speech Coal.*, 974 F.3d at 422. For one, there is a question as to each member whether SB 351 applies to it at all. But even assuming SB 351's application and assuming it regulates speech, that raises a question of tailoring: whether the incidental burden on speech is permissible or not. That burden will vary based on different members' resources (not to mention that some of them might already do age verification).

The district court erroneously decided none of that matters because NetChoice pursues a facial challenge. Doc. 34 at 12–13. But asserting a facial challenge doesn't erase the need to show that membership participation is not required. The Eleventh Circuit has required membership participation even in a facial

challenge, *see Ga. Cemetery Ass'n*, 353 F.3d at 1322, which makes sense. A facial analysis under the First Amendment requires weighing constitutional versus unconstitutional applications of a law. *Moody*, 603 U.S. at 724. As it relates to member participation for associational standing, the Court must know *at least* how the law will burden each member to assess the unconstitutional applications against the constitutional ones. *Id.* And that requires member participation. *See, e.g.*, *Free Speech Coal.*, 974 F.3d at 422. And even if NetChoice could somehow establish associational standing based on some high level and generic facial challenge, that would only set it up for inevitable failure on showing the availability of facial relief. It would not be possible to show all of the individualized factual questions needed to assess the varying burdens SB 351 may impose across different platforms.

The district court recognized the variation in how SB 351 may burden NetChoice's members, but it inexplicably concluded the variation *establishes* standing. It reasoned that the State's position that "the law will apply to each platform differently … underscores the disparate application that renders the Act so problematic." Doc. 34 at 13. What the district court described as "disparate application" is just another way of saying

"individualized inquiries"—which is what bars associational standing.  *See, e.g.*, *Free Speech Coal.*, 974 F.3d at 421–22.  And whether the law is "so problematic" because of varying burdens has to do with the merits, not standing.  *See, e.g.*, *Club Madonna, Inc. v. City of Miami Beach*, 924 F.3d 1370, 1382 (11th Cir. 2019).

## B.   NetChoice cannot rely on third-party standing and the purported rights of its members' users.

NetChoice has another standing problem.  A plaintiff ordinarily cannot assert someone else's rights.  *E.g.*, *Mata Chorwadi, Inc. v. City of Boynton Beach*, 66 F.4th 1259, 1264 (11th Cir. 2023).  Here, NetChoice purports to assert not its own rights (or even its members' own rights) but those of its members' *users*.  That is because there is no burden on *NetChoice's* speech at all.  But to unlock third-party standing, the plaintiff must show "a close relation to the third party" and that there is "some hindrance to the third party's ability to protect his or her own interests," *Harris*, 20 F.3d at 1122 (quoting *Powers v. Ohio*, 499 U.S. 400, 410–11 (1991)).  NetChoice cannot make either of those showings as to any user of social media platforms, which means it cannot base its standing on asserting those users' rights.

NetChoice lacks the required "close" or "substantial relationship" with social media platform users.  *Harris*, 20 F.3d at

1123.  Relationships that have been "recognized" as enough for third-party standing are things like doctor-patient and attorney-client.  *Id.*  Obviously whatever relationship may exist between a "trade association for internet companies," Doc. 1 at 6, and the users of the member companies is not on par.  There is not *any* relationship between NetChoice and the users of social media platforms, as opposed to the whatever relationship may exist between users and the platforms themselves.

But even if there were a relationship, it still would not work because NetChoice's and users' interests are not "properly aligned."  *Harris*, 20 F.3d at 1123.  NetChoice's exclusive purpose is to lobby and litigate for the platforms.  On the other hand, the entire point of SB 351 is to protect users' health and safety against the negative effects of being present on the platforms.  *See supra* at 7–10.  NetChoice's interests are misaligned when it wants to attack consumer protection laws like SB 351.  This case is analogous to *Harris*, for example, where the challenged policy was designed specifically to protect third-party prison guards whose speech was directly restricted, meaning prisoners could not assert the guards' rights.  20 F.3d at 1123.  Were the rule any other way, we would be in the bizarre world where every business has third-party standing to challenge the very consumer protection laws

designed to protect consumers *against the business*. The
"adversarial nature of the relationship actually
counsels *against* the grant of third-party standing in this case."
*Id.*

Beyond the nonexistent (at best) or adverse (at worst)
relationship, there also is obviously "no impediment to the ability
of the [social media platform users] to assert their own First
Amendment rights if they wish to do so." *Id.* at 1124. The driving
question is "whether it 'would be difficult if not impossible for the
persons whose rights are asserted to present their grievance
before any court.'" *Young Apartments*, 529 F.3d at 1043 (quoting
*Barrows v. Jackson*, 346 U.S. 249, 257 (1953)). There are no
barriers to users challenging SB 351. It's nothing like, for
example, minorities being afraid to challenge a discriminatory city
ordinance because they "face hostility from the residents of [the
city] and may be reluctant to raise such claims for fear of
provoking additional policing measures" or even deportation. *Id.*
at 1044. Nor is there even a stigmatic barrier like there may be
when suing to access pornography, *cf. Virginia v. Am. Booksellers
Ass'n*, 484 U.S. 383, 389, 392–93 (1988), or even suing to seek
psychiatric help, *see Pa. Psychiatric Soc'y v. Green Spring Health
Servs., Inc.*, 280 F.3d 278, 290 (3d Cir. 2002). Indeed, it is quite

likely that if social media users or parents have any "reluctance … to challenge [SB 351]" it would be because "they like it." *Harris*, 20 F.3d at 1124. So the "most important[] justification for third-party standing," the inability for the rightholder to sue, "is lacking in this case." *Id.*

There's another problem. NetChoice has neither associational standing nor third-party standing—it certainly does not have *both*. For NetChoice to assert its members' rights and to then further assert its members' rights to assert *their* users' rights leaves the realm of third-party standing and enters an unprecedented world of fourth-party standing. That is "outside the bounds of traditional associational standing." *Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*, 467 F.3d 999, 1013 (6th Cir. 2006) (McKeague, J., concurring). The Court can reject NetChoice's third-party standing argument on that basis alone.

The district court ignored the fourth-party standing problem and the third-party standing requirements. It instead held that "here, 'the statutory provision at issue imposed a duty on the [plaintiff] and the [plaintiff's] compliance with that duty indirectly violated third parties' rights.'" Doc. 34 at 15 (quoting *Mata Chorwadi*, 66 F.4th at 1266) (original brackets). The district court

relied almost exclusively on this Court's decision in *Mata Chorwadi*, but that case does not support the district court's order. Hotel owners challenged an ordinance designating hotels a chronic nuisance property if the police received two or more 911 calls from the hotel in a thirty-day period. *Mata Chorwadi*, 66 F.4th at 1262. The owners tried to assert a First Amendment challenge by asserting the First Amendment rights of their guests to call 911. *Id.* at 1264. But they could not rely on third-party standing because they were not required to comply with any legal duty that would indirectly violate guests' rights. *Id.* at 1266. There was instead "a misalignment" of interests: The hotels would be injured only if the guests' First Amendment right to call 911 was protected. *Id.* In other words, *Mata Chorwadi* rejected the hotel operator's claim of standing.

*Mata Chorwadi* did discuss requirements for third-party standing, and it held that because the plaintiff's compliance with a legal duty didn't violate third-party rights at all, that was reason enough to reject third-party standing without addressing the other requirements. *Id.* at 1266. The district court took this to mean that the inverse must be true: if a plaintiff's compliance with a legal duty implicates the rights of a third party, there *must* be standing. Doc. 34 at 14–15. But that is plainly not the case.

Third-party standing requires more, *see, e.g.*, *Powers*, 499 U.S. at 410–11, and *Mata Chorwadi* does not assert otherwise. Plus, none of this solves the fatal fourth-party standing problem: SB 351 imposes no "duty" or "compliance" responsibilities on NetChoice, the only plaintiff in the case.

The district court also made a passing reference to the idea that when "a plaintiff has standing and a cause of action to assert its own First Amendment rights, it can also raise the rights of third parties to support its merits arguments." Doc. 34 at 14 (quoting *Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, No. 4:24CV438-MW/MAF, 2025 WL 1570007, at *27 (N.D. Fla. June 3, 2025)). But even by its own telling, NetChoice isn't asserting "its *own* First Amendment rights." *Id.* (quotation omitted and emphasis added).

NetChoice lacks standing, and this Court should reverse.

## II. NetChoice is unlikely to succeed on the merits of its claims.

The age verification and parental consent provisions do not run afoul of the First Amendment. They don't impinge on speech at all, but even if they do, they satisfy scrutiny. Separately, the age verification provision is not unconstitutionally vague, and the

ad provision is not preempted by § 230. At the least, NetChoice
cannot prevail in a facial challenge.

### A. SB 351's age verification and parental consent provisions do not trigger, much less violate the First Amendment.

NetChoice's challenge to the age verification and parental
consent provisions fail at multiple levels. At the start, those
provisions don't regulate speech at all. But even if they did, they
would be content-neutral, incidental burdens on speech that are
subject to only intermediate scrutiny, which they satisfy.

### 1. The age verification and parental consent provisions regulate minors contracting with corporations to access locations, not speech.

**a.** SB 351 is not a speech regulation. It regulates minors
entering contracts. And it regulates minors accessing locations. It
is no different than typical gatekeeping laws that few would
question in relation to brick-and-mortar businesses. *See, e.g.*,
*Paxton*, 145 S. Ct. at 2306–08.

The age verification and parental consent provisions apply
only to "account holders." O.C.G.A. § 39-6-2(a), (c). Platforms
invariably require users to enter contracts to create accounts and
profiles, Doc. 23-2 at 6, and to thus become "account holders,"
O.C.G.A. § 39-6-1(1). Those contracts can have onerous terms,

subjecting users to arbitration, indemnification, and exclusive jurisdiction and choice of law clauses, and allowing the platforms to use users' data and posts and photos for the platforms' own purposes. *See, e.g.*, Doc. 23-3 at 11–13, 20, 55, 82–83. And of course, the platforms use the accounts as a launching point for gathering and selling massive amounts of data about users. *See, e.g.*, Federal Trade Comm'n, *A Look Behind the Screens: Examining the Data Practices of Social Media and Video Streaming Services*, iv–vii (Sep. 2024), https://tinyurl.com/4cn98c6c. States can of course regulate when the platforms can enter those contracts, especially with minors. *E.g.*, O.C.G.A. §§ 13-3-20–21. States regulate all aspects of contracting. *See, e.g.*, *id.* §§ 13-8-2(a) (contracts contrary to public policy unenforceable)*,* 13-3-5 (impossible, immoral, and illegal conditions are void), 13-3-24 (contract voidable if insane), 13-3-25 (same if intoxicated); *In re Checking Acct. Overdraft Litig. MDL No. 2036*, 672 F.3d 1224, 1229 (11th Cir. 2012) (discussing unconscionable contracts); *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1377–79 (11th Cir. 2005) (same).

This restriction on minor contracting has nothing inherently to do with speech. There is no restriction on anyone saying, reading, or viewing anything. There is certainly no restriction on

a platform's speech. Their protected expression consists of their content moderation, *Moody,* 603 U.S. at 739, and SB 351 places no limits on that. The law comes into play only at the stage of *access,* i.e., can an under-16 minor form an agreement, without parental consent, that allows the minor to enter the website.

A contracting regulation doesn't transform into a speech regulation just because one or both of the contracting parties engages in speech. This Court has held that an ordinance prohibiting minors from entering an establishment serving alcohol did not regulate speech even when the minor's only reason for entering was to attend a political petition drive. *Indigo Room*, 710 F.3d at 1297–1300. The establishment claimed a "right to host individuals under 21 years old to engage in political speech, association, and assembly" and the minor claimed a right to engage in political speech. *Id.* at 1299. The claims failed because the ordinance did "not regulate speech" but merely the "admittance of underage individuals into alcoholic beverage establishments while alcohol is being served or sold to the public." *Id.* at 1300. That the only reason the minor wanted to enter was to engage in speech was irrelevant. The Court compared the ordinance to one it had considered in *Gary v. City of Warner Robins*, 311 F.3d 1334, 1336 (11th Cir. 2002), which prohibited

people under 21 from working in establishments that sold alcohol. That ordinance had the effect of preventing the plaintiff from engaging in protected expression at one such establishment. *Id.* at 1340. But it was not a speech regulation at all, merely "an ordinance that restricts [the plaintiff's] right to enter establishments that primarily serve alcohol." *Id.*

SB 351's age verification and parental consent provisions are no different. SB 351 identifies the *location* that poses a danger to children—addictive social media platforms—and regulates the ability of minors to contract to enter that location. That affects only the "right to enter" the location, *see id.* at 1340, or the "admittance of underage individuals," to it, *see Indigo Room*, 710 F.3d at 1300. Speech may happen at the location, and people may even want to enter solely for the purpose of engaging in speech, but that does not transform SB 351 from an access-regulation into a speech regulation. *See id.* The presence of speech does not even transform the law into one that "incidentally infringes" speech. *Id.* Of course, social media platforms are digital locations, not physical ones, but that's no reason to treat them differently for gatekeeping purposes.

**b.** The district court concluded that SB 351 regulates speech primarily by reference to the Supreme Court's decision in *Brown*

*v. Entertainment Merchants Association*, 564 U.S. 786 (2011). Doc. 34 at 24. That case addressed a content-based statute that outright prohibited the sale of violent video games to minors. 564 U.S. at 789. The Supreme Court held the prohibition violated the First Amendment because it was a content-based speech regulation that failed strict scrutiny. *Id.* at 799. The district court reasoned that *Brown* precludes the State's contract-based argument. Doc. 34 at 23–24.

But contra the district court's understanding, *Brown* had nothing to do with contracting, nor does it undermine the State's location-based arguments. *Brown* addressed a content-based, outright ban on the sale of certain speech. The statute in *Brown* said nothing about locations, and whatever miniscule "contract" may have been involved (exchanging money for a product, with no further terms) is nothing like the contract issues in this case, which implicate numerous substantive rights. *See supra* at 32–33. Beyond that, the statute in *Brown* was explicitly content-based; the whole point was to target "violent" video games. 564 U.S. at 799. SB 351 is neither content-based nor singling out and suppressing any particular protected expression. Plus, unlike the statute in *Brown*, SB 351 is not an outright ban on speech at all, and that matters. It is more akin to restricting access to the video

game store because dangerous people are inside. And that's just *Indigo Room*.

The district court brushed *Indigo Room* aside by reasoning that, unlike the ordinance in *Indigo Room*, SB 351 "regulates a primary forum of speech." Doc. 34 at 24. It's unclear what exactly the court meant. Nothing about *Indigo Room* turns on the degree to which a location is a "forum of speech," nor is it clear what a "primary forum of speech" is. This Court was clear that its decisions in *Indigo Room* and *Gary* did not turn on any "differing level of constitutional protection" afforded the speech inside the location because the laws did "not infringe [the plaintiffs'] speech in the first instance." *Indigo Room*, 710 F.3d at 1300. Maybe the district court thought social media platforms are a "primary forum of speech" because they host speech. But so did the establishments in *Indigo Room* and *Gary*—and that was the entire reason the plaintiffs wanted to enter those establishments. And again, nothing about the internet should change the underlying point that speech happening inside a location does not make restricting access to the location a regulation of speech. *See Indigo Room*, 710 F.3d at 1300; *Gary*, 311 F.3d at 1340.

To regulate speech a law must actually regulate speech, not just contracts and not just access to a place where speech happens.

The age verification and parental consent provisions regulate contracting and access, not speech.

> **2. At most, the age verification and parental consent provisions are content-neutral regulations with an incidental effect on speech and they satisfy intermediate scrutiny.**

Even if SB 351 could be classified as some kind of marginal speech regulation, it would be a content-neutral one subject to intermediate scrutiny. And it satisfies intermediate scrutiny.

**a.** A law is content-neutral "if the government's reasons for regulating speech have nothing to do with content." *Granite State Outdoor Advert., Inc. v. City of St. Petersburg, Fla.*, 348 F.3d 1278, 1281 (11th Cir. 2003). A law is content-*based* when it "discriminate[s] based on the topic discussed or the idea or message expressed." *City of Austin,* 596 U.S. at 73–74 (quotation omitted).

SB 351 does not seek out or regulate any particular content. Neither the age verification nor parental consent provision themselves have any content-based language. Their application instead turns on SB 351's definition of "social media platform," which excludes websites with certain *functions*, like email, streaming services, online shopping, gaming, cloud storage, document collaboration, teleconferencing, technical support, and

so on.  O.C.G.A. § 39-6-1(6)(A)–(V).  But differentiating between functions does not "discriminate based on the topic discussed or the idea or message expressed." *City of Austin*, 596 U.S. at 73–74.

The "substantive message" is "irrelevant to the application of the" law; any peak at content is just to "inform[s] the [website's] relative location." *Id.* at 71.  Everything about SB 351 is concerned with defining the location where age verification and parental consent is needed, not discriminating against any particular speech that happens at that or other locations.

NetChoice's own complaint proves the point.  NetChoice alleges that a teen can read content on the Atlanta Journal Constitution's website but not on Facebook, watch sports videos on ESPN but not Instagram, and listen to Taylor Swift on Spotify but not YouTube.  Doc. 1 at 36.  That conclusively proves the law is *not* targeting the content; it's targeting the *location*.  It is like treating a record store differently from an arena.  Teens listening to Taylor Swift at a record store (Spotify), for example, present fewer concerns than teens listening at a large stadium (YouTube).  At the stadium the teen may be surrounded by thousands of strangers, illicit activity, and dangers for minors.  Treating the two *places* differently isn't content-based discrimination.

The district court concluded that SB 351 is content-based only by directly contravening Supreme Court precedent. It ruled SB 351 content-based because enforcing SB 351 requires "looking" at "posts" on websites and because it draws some speaker-based distinctions. Doc. 34 at 23, 25–26. Neither justification works.

The district court's "you have to read the posts" reasoning is exactly what the Supreme Court rejected in *City of Austin*: a "rule[] which holds that a regulation cannot be content neutral if it requires reading the sign at issue, is too extreme an interpretation of this Court's precedent." *City of Austin*, 596 U.S. at 69. In *City of Austin*, the law was content neutral even though it treated signs that advertised things located on the premises differently than signs that directed people to offsite locations. *Id.* at 71. Even if the law required *reading* the signs, it was content-neutral because the "sign's substantive message itself [was] irrelevant to the application of the" law. *Id.* There were "no content-discriminatory classifications," the law "distinguish[ed] based on location," and the "message on the sign matter[red] only to the extent that it inform[ed] the sign's relative location." *Id.*

The district court could not have more clearly deviated from binding precedent.[5]

The district court was just as wrong in relying on differentiations among speakers. Some of the exceptions to the definition of social media platform distinguish between user-created and platform-created (or platform-selected) speech. One exception, for example, is websites whose "predominant or exclusive function" is "content that is preselected by the provider and not user generated." O.C.G.A. § 39-6-1(6)(D). The district court applied an elementary binary to that: because it is speaker-based, the law is content-based. Doc. 34 at 25–26.

But the Supreme Court has been clear that "a differential burden on speakers is insufficient by itself to raise First Amendment concerns." *Leathers*, 499 U.S. at 452. The Court just reaffirmed that point in the social media context. *See TikTok Inc.*, 604 U.S. at 72–73. A law can apply to only a *single specific* social media platform and still not be content-based. *See id.*

---

[5] And that assumes you have to read anything to know whether SB 351 applies in the first place. It is actually the ability to upload posts, interact with others, etc., that defines a social media platform under the statute. O.C.G.A. § 39-6-1(6). You do not have to *read* the posts to examine those indicators.

The correct rule is that speaker-based distinctions matter only when the distinction "is directed at, or presents the danger of suppressing, particular ideas," *Leathers*, 499 U.S. at 453, or when the "speaker preference reflects a content preference," *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 658 (1994). The district court didn't even consider that question. And its own examples of how SB 351 is speaker-based prove that no content is being targeted. The court posited that SB 351 would apply to a Georgia Bulldogs Reddit forum but not Barstool Sports (a website that posts its own sports articles) and that it would apply to news posted by users on X but not news posted to the New York Times website. Doc. 34 at 25. Those examples show it's not the *content* that drives any distinction.

SB 351's distinction between user-generated and platform-generated content is instead like distinctions the Supreme Court has recognized as content-neutral. Directly analogous is *Turner*, where a law requiring cable operators but not broadcasters to carry certain programming was content-neutral because the "special characteristics of the cable medium" supported differential treatment. 512 U.S. at 661. Even though the law "favored" one speaker while "burden[ing]" another, it was content-neutral because the differential treatment was based on "the

manner in which [the] speakers transmit their messages," not the content of any messages. *Id.* at 645. The same is true of SB 351. The minor burdens of verifying age or parental consent apply to websites that have the functionality that is dangerous for children, not particular *messages*.

**b.** A law satisfies "intermediate scrutiny if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Paxton*, 145 S. Ct. at 2317 (quotation omitted). The standard is not a least-restrictive-means test, *id.* at 2317, and it doesn't matter if the law is "underinclusive," *see Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015). Instead, the law is constitutional if "the government's interest would be achieved less effectively absent the [law]." *Paxton*, 145 S. Ct. at 2317 (quotation omitted).

There can be no serious dispute that Georgia has a substantial interest in protecting children from the "unprecedented dangers" of online harms, including social media platforms. *Moody*, 603 U.S. at 716; *see also supra* at 7–10. The district court did not question the State's interest. *See* Doc. 34 at 27–28.

Accordingly, the only question is whether SB 351 substantially overburdens speech. It doesn't. The Supreme Court just told us: "Under [the intermediate scrutiny] standard, requiring age verification online is plainly a legitimate legislative choice." *Paxton*, 145 S. Ct. at 2317. It "ensures that an age-based ban is not ineffectual, while … allowing adults full access to the content in question after the modest burden of providing proof of age." *Id.* SB 351's "specific verification methods" are "also plainly legitimate." *See id.* Requiring age-verification through "government-issued identification or transactional data" is "well within the State's discretion under intermediate scrutiny." *Id.* at 2317–18. SB 351 imposes even less of a burden because it allows "commercially reasonable efforts," O.C.G.A. § 39-6-2(a), which includes at least the methods expressly approved by the Supreme Court. It necessarily satisfies intermediate scrutiny.

Even setting *Paxton* aside, the age verification and parental consent provisions are both "adequately tailored." *See Paxton*, 145 S. Ct. at 2318. Any burden on speech is indirect and miniscule, manifesting only through a minor burden on accessing a place where speech is happening. The law does not restrict any speech on any topic from any user on any platform, nor does it restrict any platform's own expression. That can hardly be said to

"burden substantially more speech than is necessary." *See id.* at 2317.

The analysis might be different if compliance were some kind of Herculean task, but that's just not the case. Again, age-verification is only a "modest burden." *Id.* It can be done easily, at minimal cost, and through various methods. Doc. 23-2 at 5–13, 22–23. Parental consent can also be confirmed easily, and there are established methods and organizations to use in doing so. *Id.* at 21–22. None of this is some new burden platforms would have to figure out for the first time. *E.g.*, *id.* at 7; *Paxton*, 145 S. Ct. at 2317–18. There are numerous technologies that facilitate compliance, and those technologies are constantly and rapidly evolving, with costs rapidly falling. Doc. 23-2 at 7–11, 21–22. NetChoice's members already do these things in some capacities and in some countries. *Id.* at 4, 9, 22–23. And on top of everything else, by requiring "commercially reasonable efforts," O.C.G.A. § 39-6-2(a), SB 351 inherently tailors the law to minimize any incidental speech burdens that may come with compliance costs.

The district court reached the opposite conclusion via multiple errors. It greatly exaggerated the burdens SB 351 imposes on speech. And, perversely, it ruled that the very "commercially

reasonable efforts" standard that inherently tailors SB 351 somehow does the opposite.

At the outset, the district court went astray in concluding the "burdens imposed" by SB 351 are "enormous." Doc. 34 at 28. That cannot be reconciled with common sense or the Supreme Court's holding that "providing proof of age" online is a "modest burden." *Paxton*, 145 S. Ct. at 2317. The district court dug an even deeper hole by saying it's a "grave concern" that there is even a "possibility that Georgians would have to submit government-issued identification." Doc. 34 at 30. They don't have to do so, but also, that's *exactly* what the Supreme Court said is "well within the State's discretion." *Paxton*, 145 S. Ct. at 2318.

As to the parental consent provision in particular, the court reasoned that it would be "insurmountable" for some kids—presumably meaning those whose parent won't consent. Doc. 34 at 28. To be clear, NetChoice has no business asserting whatever rights minors may have. *See supra* at 26–31. But anyway, the district court cannot have meant that parents don't get to make that decision. Children need their parents' permission to go to all kinds of places, and not even NetChoice has argued that federal courts can intervene to override those parental decisions. That would lead to the absurd conclusion that, when parents use

parental controls on computer devices, or even deny a child computer access entirely, the minor child could sue the parent to override the decision.

The district court relied on a footnote of dicta from *Brown*, a case which did not involve a parental consent provision at all. Doc. 34 at 29; *see also Brown*, 564 U.S. at 795 n.3. The *Brown* Court opined that the State likely does not have "the power to prevent children from hearing or saying anything without their parents' prior consent," such as entering a political rally or church without "prior written consent." *Id.* (emphasis removed). Whatever force that dicta has elsewhere, it is irrelevant here. The Supreme Court was addressing children being barred from certain speech specifically because of its content. Nobody could think *Brown*'s footnote of dicta applies to the vast majority of locations where parental consent can obviously be required prospectively. And social media platforms cannot be compared to political rallies or churches, even if some political or religious speech may happen there. *See supra* at 34–35, 37, 50.

Further seeking some kind of burden to attribute to SB 351, the district court speculated that users would stop using social media platforms based on fears their data will be hacked. Doc. 34 at 33. The Supreme Court rejected the same arguments about

"privacy concerns" in *Paxton*, including because the regulated "entities have every incentive to assure users of their privacy." 145 S. Ct. at 2318–19.  Relatedly, the district court reasoned that age verification "would potentially all but kill anonymous speech online."  Doc. 34 at 34.  But that's just wrong because age-verification is not necessarily recognition technology, Doc. 23-2 at 12, 24, nor is there any requirement that a platform maintain any database of government identification and corresponding account.

As to the burden on platforms themselves, the court concluded SB 351 would "impose significant compliance costs … threatening their ability or willingness to access audiences."  Doc. 34 at 35.  The Supreme Court already rejected that line of reasoning in *Paxton*.  145 S. Ct. at 2317.  And the compliance costs are not onerous.  Doc. 23-2 at 5–13, 22–23.  The court could identify only one possible NetChoice member who may face meaningful difficulty complying because it is a "smaller platform[]."  Doc. 34 at 35–36.  But the court ignored that SB 351 requires only "commercially reasonable efforts."  O.C.G.A. § 39-6-2(a), (c).  Past that, the court speculated that "bigger companies may simply choose to stop operating in Georgia, rather than face the compliance costs."  Doc. 34 at 36.  Empty threats of departure don't make a law unconstitutional, not least because *any law* can

be attacked that way. And no NetChoice member has said it would stop operating in Georgia. (Besides, all this analysis confirms both that associational standing and facial relief are improper.)

The district court twisted the "commercially reasonable efforts" standard from a tailoring mechanism into a reason to hold the law unconstitutional due to "under-inclusivity." Doc. 34 at 39–40. The district court asserted that the commercially reasonable efforts standard would result in "disparate enforcement" because big and small platforms may "face different levels of rigor." *Id.*

But the district court misunderstood what underinclusive means, and whether a law is underinclusive doesn't matter for intermediate scrutiny anyway. *Wacko's Too, Inc. v. City of Jacksonville*, 134 F.4th 1178, 1189–90 (11th Cir. 2025). The availability of multiple methods to verify age has nothing to do with "under-inclusivity," as everyone still has to comply. If a billion-dollar corporation and million-dollar corporation both have a 15% tax rate, the billion-dollar corporation will pay more taxes. That doesn't mean there are "different levels of rigor." Doc. 34 at 40. Nothing about the "commercially reasonable efforts" standard is problematic. *Cf. Fitch*, 134 F.4th at 809 (remanding for fact

finding about different "commercially reasonable efforts" to verify age and parental consent).

The district court also reasoned that the law's exceptions make it underinclusive. Again, being underinclusive does not make a law unconstitutional, *Wacko's Too*, 134 F.4th at 1189–90, and the exceptions merely help define the locations being regulated. The court noted, for example, that SB 351 exempts gaming websites. Doc. 34 at 38–39. But gaming involves an entirely different function than social media platforms and distinguishing that function has nothing to do with expression, much less any particular content. The court also thought it was somehow contradictory to let a child contract to use Gmail but not YouTube because both are owned by Google. *Id.* at 38. It is not, and the district court could not explain why it would be. The State can obviously treat the two differently, even if they have the same parent company.

Finally, even if some exception somehow was a problem, that is not a reason to enjoin enforcement of the entire law, much less facially. An injunction should go no further than necessary "to "remove the seeming threat" to speech, *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973), and "a statute may be declared invalid to the extent that it reaches too far, but otherwise left intact," *Ayotte*

*v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) (quotation and ellipsis omitted). Applied to SB 351, that would mean the State should have the option of enforcing the law with the purportedly problematic exception enjoined. That would remedy whatever content-based speech regulation problem the district court perceived in the definition of "social media platform."

For all those reasons, if the Court even reaches scrutiny, SB 351's age verification and parental consent provisions satisfy it.

## B. SB 351's age verification provision is not unconstitutionally vague.

The district court ruled that the age verification provision is unconstitutionally vague because it allows compliance through "commercially reasonable efforts." Doc. 34 at 43–44. NetChoice never asked the court to reach that conclusion—not in its complaint, motion for a preliminary injunction, or its reply brief in support of that motion. *See* Doc. 1 at 38–40; Doc. 5-1 at 39–40; Doc. 26 at 23. The district court invented an entirely different challenge to an entirely different part of SB 351 than what NetChoice actually asserted. That was improper. *See, e.g.*, *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 980 (11th Cir. 2005) (where complaint challenges only certain government ordinances,

other ordinances can't be addressed).  The district court should be reversed on that basis alone.

Anyway, there's a reason NetChoice didn't challenge "commercially reasonable efforts" as an unconstitutionally vague term: It's obviously not.  It is hard to fathom the implications of holding that this "reasonableness" standard is vague.  Out goes the Fourth Amendment.  Out goes the Fair Credit Reporting Act. *See, e.g.*, 15 U.S.C. § 1681e(a) (requiring "reasonable procedures" and "reasonable effort").  Out goes the Americans with Disabilities Act.  *See, e.g.*, 42 U.S.C. § 12112(b)(5)(A) (requiring "reasonable accommodations").  Out goes Title VII's protection of religious exercise.  *See, e.g.*, *Id.* § 2000e(j) (same).  Out goes common law negligence and legal malpractice.  *See, e.g.*, *Cox-Ott v. Barnes & Thornburg, LLP*, 915 S.E.2d 894, 897 (Ga. 2025).  The list of reasonableness standards, and even "commercially reasonable" standards, across statutes and caselaw is almost unending.[6]  It's

---

[6] *See, e.g.*, 8 U.S.C. § 1153 ("commercially reasonable efforts" in immigration visa context); 11 U.S.C. § 562(b) (bankruptcy code incorporating "commercially reasonable determinants of value"); 17 U.S.C. § 115 ("commercially reasonable efforts" in music copyright context); 31 U.S.C. § 5318 (reasonableness standard in banking statutes); 47 U.S.C. § 201 (reasonableness standard in common carrier statutes); *Fuld v. Pal. Liberation Org.*, 606 U.S. 1, 13–14, 24 (2025) (reasonableness standard in personal jurisdiction).

also prevalent in NetChoice's members' own terms of use.  *See* Doc. 23-3 at 28, 170, 175 ("reasonable steps"), 32, 127 ("reasonable notice"), 63, 71, 172 ("reasonable efforts"), 148 ("reasonable assistance"), 152, 176 ("reasonable control"), 175 ("reasonable diligence").

And to be clear, other courts have discussed the same "commercially reasonable efforts" language in social media laws without any confusion at all—even remanding for a district court to consider all its different applications to different platforms.  *See Fitch*, 134 F.4th at 809.  The district court's holding—which again, nobody asked for—should be reversed.

## C.   SB 351's ad provision does not violate Section 230.

SB 351's ad provision prohibits the "display of any advertising in the minor account holder's account based on such minor account holder's personal information, except age and location." O.C.G.A. § 39-6-3(1).  The district court ruled that provision is preempted by § 230, but only by misunderstanding both § 230 and the ad provision.

Section 230 prohibits treating social media platforms "as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  The law protects websites against lawsuits "that would make service

providers liable for information originating with a third-party user," *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006) (quotation omitted).

The ad provision doesn't treat social media platforms "as the publisher or speaker of any information provided by another information content provider." It regulates a platform's *own* conduct. Section 230 is about liability based "on the harm done by third-party content," not liability "purely based on whether [websites] comply with the statute, independently of whether the third-party speech that plaintiffs host harms anybody." *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 285 (5th Cir. 2024), *aff'd on other grounds* 145 S. Ct. 2291.

The district court missed those points entirely and treated the ad provision as if it exposes platforms to tort-like liability based on harms caused by hosted content. Doc. 34 at 45. Without meaningful discussion, the court pointed to irrelevant tort cases. *Id.* Take *Doe v. MySpace, Inc.*, 528 F.3d 413 (5th Cir. 2008), for example. Section 230 preempted a common law claim based on a platform's failure to monitor messages between a user and a minor. *Id.* at 420–22. That's nothing like the ad provision. And inexplicably, the district court thought that *A.B. v. Salesforce, Inc.*, 123 F.4th 788 (5th Cir. 2024), supported § 230 preemption.

Doc. 34 at 45.  But that's exactly backwards.  The Fifth Circuit held that a platform *could* be liable for sex-trafficking claims because liability came not from the actions of the defendant related to its role as a publisher of third-party content but from a statutory duty held by the public at large.  *A.B.*, 123 F.4th at 798.  Similarly, the ad provision is not preempted because it imposes a separate rule on platforms' own conduct—and one that doesn't necessarily restrict any content, anyway.

### D.  NetChoice cannot succeed on any facial claim.

To evaluate a facial challenge, a court must first assess a law's full scope.  *Moody*, 603 U.S. at 723–26.  Then the court must assess—as to the many possible applications—whether those applications are constitutional or unconstitutional.  *Id.*  And only if the unconstitutional applications "substantially outweigh" the constitutional applications is facial relief appropriate.  *Id.*  In the context of websites, the same law is likely to impact each differently and require separate analyses.  *See id.* at 725.

Applied here, the district court needed to define "[w]hat activities, by what actors, do the [provisions] prohibit or otherwise regulate."  *Id.* at 724.  It never did.  It never even specified the full list of NetChoice's members that SB 351 applies to.  *See* Doc. 34 at 9 (referring to some members but not even the full list alleged in

NetChoice's complaint); *see also* Doc. 1 at 7. Nor did it consider applications beyond NetChoice's members, which it was required to do. The court may have thought SB 351's definition of social media platform "creates a complicated web of what is (and is not) subject to the law." Doc. 34 at 22. But that just shows the need to define the universe.

The district court also didn't properly assess different applications. In *Moody*, one part of the law challenged required "asking … as to each thing covered, whether the required disclosures unduly burden expression." *Moody*, 603 U.S. at 725. The same is true here: whatever minimal compliance burdens SB 351 imposes may vary as to different platforms, requiring distinct tailoring analyses. The district court failed to account for that. The court also failed to consider, as *Moody* instructed, how SB 351 may apply to platforms that either don't or only marginally engage in the protected expression of content moderation. For example, SB 351's application (if any) to Snapchat, which "enables users to have digital conversations," Doc. 1 at 9–10, is categorically different than its application to Facebook. "Curating a feed and transmitting direct messages, one might think, involve different levels of editorial choice, so that the one creates an expressive product and the other does not." *Moody*, 603 U.S. at

725–26.  Similarly, SB 351's application (if any) to websites like X and Reddit raises entirely distinct questions because those places allow outright pornography.  *See Paxton*, 145 S. Ct. at 2317–2318; *see also* Adult Content, X (May 2024), https://tinyurl.com/5e5abp2b; Emile Marzolf & Eliza Gkritsi, *X, Bluesky and Reddit in France's crosshairs amid porn clampdown*, Politico (June 11, 2025), https://tinyurl.com/yhyxkdvb.

The district court tried to short-circuit *Moody* by asserting that "the law's constitutionality hinges on the same analysis in each application."  Doc. 34 at 19.  The court never actually explained how that's true.  The court's reasoning was not even consistent.  It insisted that SB 351 is "problematic" because the "commercially reasonable efforts" standard could result in different burdens on different platforms.  *Id.* at 13, 39–40.  That doesn't make the law problematic, *see supra* at 49–50, but it does mean the tailoring questions may be different as to different platforms, *see Moody*, 603 U.S. at 725–26; *Fitch*, 134 F.4th at 809; *supra* at 23–24.

The Fifth Circuit has recognized similar flaws in a district court's facial review of a challenge to a similar Mississippi law.  *Fitch*, 134 F.4th at 809.  The district court there "did not apply *Moody* in the manner now required" because it didn't

"determin[e] the full scope of actors regulated by the Act and the activities it regulates." *Id.* The district court here didn't do that either. And in *Fitch*, the district court erred because it "did not determine the 'commercially reasonable efforts'" that each different platform could use, even though those "requirements [were] likely to be different with each [platform] facing a unique regulatory burden." *Id.* That was crucial because some platforms "may not need to devote additional resources" to comply, while for others the "requirements may reach beyond their resources." *Id.* But "[w]ithout a factual analysis determining the commercially reasonable effort demanded of each individual" platform, the court could not measure constitutional applications versus unconstitutional ones. *Id.* The district court here didn't do that either.

The Fifth Circuit vacated the preliminary injunction in *Fitch* because under the *Moody* framework "a factual inquiry remains." *Id.* This Court should hold the State just wins outright. But if it disagrees, it should at least do what the Fifth Circuit did: vacate because of an improper facial analysis.

### III. NetChoice does not face irreparable harm and the equities weigh heavily against it.

Even if NetChoice could show a likelihood of success on the merits, it would not be entitled to preliminary injunctive relief. Notably, following the Fifth Circuit's remand in *Fitch*, the district court preliminary enjoined the enforcement of Mississippi's law on an as-applied, not facial basis, but the Fifth Circuit stayed that preliminary injunction pending appeal. *NetChoice, L.L.C. v. Fitch*, No. 25-60348, 2025 WL 2078435 (5th Cir. July 17, 2025). NetChoice asked the Supreme Court to vacate the stay and reinstate the preliminary injunction, but the Court denied the application. *Fitch*, 2025 WL 2350189. At best for NetChoice, there is nothing different about its situation in Mississippi than its situation in Georgia.

But even setting *Fitch* aside, NetChoice does not face irreparable harm, which requires denying injunctive relief. *See, e.g.*, *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990). NetChoice's year-long delay proves it. NetChoice waited until the eve of SB 351's effective date to file its complaint. The "very idea of a *preliminary* injunction is premised on the need for speedy and urgent action." *Wreal*, 840 F.3d at 1248. That's why this Court has held that "failure to act with speed or urgency" and a delay of

"even only a few months" is enough to "undermine[] a finding of irreparable harm." *Id.* The district court dismissed this concern based on an oral statement from NetChoice's counsel that NetChoice waited to sue in hopes the Georgia General Assembly in 2025 might change the law it had just passed in 2024. Doc. 34 at 46–47. It is hard to think of a more baseless "explanation." There's no evidence to support it and even if it were true, if NetChoice *needs a preliminary injunction*, it should have filed suit immediately anyway. And by the way: NetChoice delayed another month after the 2025 legislative session adjourned.

In addition, SB 351 has a limited enforcement mechanism: only the Attorney General can enforce it, and only after a 90-day notice period. O.C.G.A. § 39-6-4. NetChoice filed its lawsuit within 90 days of SB 351's effective date—and it obtained preliminary relief well within 90 days of its motion. There is every likelihood that in response to an actual enforcement notice an actual NetChoice member could properly seek relief—based on actual facts on the ground—before any penalty.

The balance of equities is also firmly in the State's favor. The State suffers irreparable harm any time it "is enjoined by a court from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts,

C.J., in chambers) (quotation omitted). Social media platforms knowingly push products designed to be addictive to children, despite the well-established and well-known harms they cause. SB 351 imposes marginal compliance burdens on the platforms to verify age and parental consent, and the law will help ameliorate the many negative effects social media platforms have on children. Mega-corporations' minor compliance costs (especially in the light of a plethora of cheap technologies to help) pale in comparison to the State's interest here.

## CONCLUSION

For the reasons set out above, this Court should reverse the judgment of the district court.

Respectfully submitted.

| | |
|---|---|
| | /s/ *Elijah J. O'Kelley* |
| Logan B. Winkles | Christopher M. Carr |
| *Deputy Attorney General* | *Attorney General of Georgia* |
| Riley B. Liu | Stephen J. Petrany |
| *Assistant Attorney General* | *Solicitor General* |
| | Elijah J. O'Kelley |
| | *Deputy Solicitor General* |
| | Office of the Georgia |
| | Attorney General |
| | 40 Capitol Square, SW |
| | Atlanta, Georgia 30334 |
| | (470) 816-1342 |
| | eokelley@law.ga.gov |
| | *Counsel for Defendant-Appellant* |

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 12,470 words as counted by the word-processing system used to prepare the document.

/s/ *Elijah J. O'Kelley*
Elijah J. O'Kelley

## CERTIFICATE OF SERVICE

I hereby certify that on September 24, 2025, I served this brief by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.


<u>/s/ *Elijah J. O'Kelley*</u>
Elijah J. O'Kelley