# In the United States Court of Appeals for the Eleventh Circuit

NETCHOICE,

*Plaintiff-Appellee,*

*v.*

ATTORNEY GENERAL, STATE OF GEORGIA,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of Georgia, Atlanta Division
Civil Action No. 1:25-cv-02422—Amy Totenberg, *Judge*

## BRIEF OF PLAINTIFF-APPELLEE NETCHOICE

Joshua P. Morrow
LEHOTSKY KELLER COHN LLP
7500 Rialto Blvd. Suite 1-250
Austin, TX 78735
(512) 693-8350

Jared B. Magnuson
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305

Scott A. Keller
  *Counsel of Record*
Steven P. Lehotsky
Serena M. Orloff
Jeremy Evan Maltz
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW
  Suite 700
Washington, DC 20001
scott@lkcfirm.com

*Counsel for Plaintiff-Appellee*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-1, 26-2(b), Plaintiff-Appellee NetChoice hereby certifies that there are no additional attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this particular case on appeal that were omitted from the Appellant's certificate or the certificate supplied by amici curiae. *See* CA11.Dkt.13 at C-1; CA11.Dkt.17 at i-iv.

Pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1, 26.1-2, and 26.1-3, Plaintiff-Appellee respectfully submits this Corporate Disclosure Statement and states as follows: NetChoice has no parent corporation, and no publicly held corporation owns ten percent or more of its stock.

November 24, 2025

/s/ *Scott A. Keller*
Scott A. Keller
Counsel of Record for
Plaintiff-Appellee NetChoice

## STATEMENT REGARDING ORAL ARGUMENT

Although the district court correctly entered a preliminary injunction, Plaintiff-Appellee NetChoice agrees with Defendant-Appellant Attorney General that oral argument would aid the Court in resolving the important First Amendment and standing issues presented in this appeal.

# TABLE OF CONTENTS

Table of Citations ................................................................ iv

Introduction ....................................................................1

Statement of the Issues ........................................................3

Statement of the Case ..........................................................3

    A.  Factual background ........................................................3

        1.  Regulated websites disseminate vast amounts of fully
protected expression....................................................3

        2.  Parents have many tools to oversee how their children
use the internet and covered websites......................4

        3.  Many websites advertise to make their services
available for free...........................................................5

    B.  Georgia Senate Bill 351 ................................................6

    C.  Procedural history .........................................................8

Summary of the Argument.....................................................9

Standard of Review..............................................................11

Argument ..........................................................................12

  I.  NetChoice is likely to succeed on the merits of its First
Amendment and vagueness claims.......................................12

    A.  The Act's parental-consent requirements violate the
First Amendment by restricting minors' access to fully
protected speech. ........................................................13

        1.  The Act's parental-consent requirements regulate
speech. ........................................................................13

        2.  The Act's parental-consent requirements fail any form
of heightened First Amendment scrutiny.............................18

B.   The Act's age-verification requirements violate the First
     Amendment and Due Process Clause. ..........................................22

     1.   The Act's age-verification requirements trigger
          heightened First Amendment scrutiny and are
          unconstitutionally vague. ........................................................22

     2.   The Act's age-verification requirements fail any form
          of heightened First Amendment scrutiny. .............................25

C.   The Act's advertising restrictions violate the First
     Amendment. ......................................................................................28

D.   All of the Act's speech regulations are content-based, so
     they all trigger and fail strict scrutiny. ..........................................31

E.   The Act's speech restrictions are facially
     unconstitutional, and the district court's decision can be
     affirmed under NetChoice's as-applied challenges. ...................36

II.  NetChoice is likely to succeed on the merits of its 47 U.S.C.
     § 230 preemption claim challenging the Act's advertising
     restrictions. ................................................................................................44

III. NetChoice has standing. ........................................................................46

A.   NetChoice has Article III associational standing to
     challenge the Act's speech restrictions on behalf of its
     covered members. ............................................................................46

B.   NetChoice has prudential standing to raise the First
     Amendment rights of social media website users when
     challenging laws restricting users' access to protected
     speech. ...............................................................................................52

IV.  The district court's preliminary injunction has prevented
     irreparable harm and is supported by the balance of the
     equities and the public interest. ...........................................................54

Conclusion................................................................................................................57

Certificate of Compliance ....................................................................................59

Certificate of Service .............................................................................................60

# T ABLE OF C ITATIONS *

**Page(s)**

## Cases

*A.B. v. Salesforce, Inc.,*
123 F.4th 788 (5th Cir. 2024)..................................................11, 44, 45

*Almeida v. Amazon.com, Inc.,*
456 F.3d 1316 (11th Cir. 2006)......................................................45

*Ams. for Prosperity Found. v. Bonta,*
594 U.S. 595 (2021)....................................................12, 36, 37, 38, 48

*Arcia v. Fla. Sec'y of State,*
772 F.3d 1335 (11th Cir. 2014)......................................................47

*Ashcroft v. ACLU,*
542 U.S. 656 (2004)....................................................................21

*Baggett v. Bullitt,*
377 U.S. 360 (1964)....................................................................24

*Barr v. Am. Ass'n of Pol. Consultants,*
591 U.S. 610 (2020)...........................................................32, 35, 36

*Bochese v. Town of Ponce Inlet,*
405 F.3d 964 (11th Cir. 2005)........................................................24

*Borrero v. United Healthcare of N.Y., Inc.,*
610 F.3d 1296 (11th Cir. 2010)......................................................47

*Brown v. Ent. Merchs. Ass'n,*
564 U.S. 786 (2011)..............1, 9, 13, 15-16, 18-22, 26-27, 30-31, 36, 41, 48, 51

---

* Citations upon which NetChoice primarily relies are marked with asterisks.

iv

*Buehrle v. Key West,*
813 F.3d 973 (11th Cir. 2015)........................................................16

*Butler v. Michigan,*
352 U.S. 380 (1957)........................................................26

*Calise v. Meta Platforms, Inc.,*
103 F.4th 732 (9th Cir. 2024)........................................44, 45

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,*
447 U.S. 557 (1980)........................................................30, 31

*Citizens United v. FEC,*
558 U.S. 310 (2010)........................................................17, 21

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
596 U.S. 61 (2022)........................................................34

*City of Cincinnati v. Discovery Network, Inc.,*
507 U.S. 410 (1993)........................................................33

*City of L.A. v. Patel,*
576 U.S. 409 (2015)........................................................41

*City of Lakewood v. Plain Dealer Publ'g Co.,*
486 U.S. 750 (1988)........................................................17

*Comput. & Commc'ns Indus. Ass'n v. Paxton,*
747 F. Supp. 3d 1011 (W.D. Tex. 2024)........................2, 32, 42, 46, 52

*Comput. & Commc'ns Indus. Ass'n v. Uthmeier,*
2025 WL 1570007 (N.D. Fla. June 3, 2025)........................2, 14, 16, 46, 52, 53

*Diamond Alt. Energy, LLC v. EPA,*
606 U.S. 100 (2025)........................................................46

*Doe v. Grindr Inc.,*
128 F.4th 1148 (9th Cir. 2025)........................................45

*Doe v. MySpace, Inc.,*
    528 F.3d 413 (5th Cir. 2008).............................................................45

*FCC v. Fox Television Stations, Inc.,*
    567 U.S. 239 (2012)..................................................................24, 25

*FEC v. Cruz,*
    596 U.S. 289 (2022)..................................................................12, 42

*\*Free Speech Coal., Inc. v. Paxton,*
    606 U.S. 461 (2025)........................ 1, 9, 12, 17, 18, 23, 26, 27, 28, 37

*Free Speech Coalition, Inc. v. Attorney General of the United States,*
    974 F.3d 408 (3d Cir. 2020) ......................................................49, 50

*FTC v. Match Grp., Inc.,*
    2022 WL 877107 (N.D. Tex. Mar. 24, 2022) ..................................45

*Gary v. City of Warner Robins,*
    311 F.3d 1334 (11th Cir. 2002) .......................................................18

*Georgia Cemetery Ass'n, Inc. v. Cox,*
    353 F.3d 1319 (11th Cir. 2003) .......................................................50

*Georgia v. President of the United States,*
    46 F.4th 1283 (11th Cir. 2022) ..................................................47, 55

*Greater Birmingham Ministries v. Sec'y of State for State of*
    *Alabama,*
    992 F.3d 1299 (11th Cir. 2021) .......................................................47

*Harris v. McRae,*
    448 U.S. 297 (1980)..................................................................50, 51

*Henderson v. McMurray,*
    987 F.3d 997 (11th Cir. 2021) .........................................................15

*HM Florida-ORL, LLC v. Gov. of Fla.*,
    137 F.4th 1207 (11th Cir. 2025)................................................23, 40

*Honeyfund.com Inc. v. Governor*,
    94 F.4th 1272 (11th Cir. 2024)...............................11, 47, 54, 55, 57

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977)........................................................................53

*Hurley v. Irish-American Gay, Lesbian Bisexual Group*,
    515 U.S. 557 (1995)..................................................................28, 29

*Indigo Room, Inc. v. Fort Myers*,
    710 F.3d 1294 (11th Cir. 2013) .......................................................18

*John Doe No. 1 v. Reed*,
    561 U.S. 186 (2010)........................................................................43

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004)..................................................................52, 53

*M.P. by & through Pinckney v. Meta Platforms Inc.*,
    127 F.4th 516 (4th Cir. 2025).........................................................44

*Manhattan Cmty. Access Corp. v. Halleck*,
    587 U.S. 802 (2019)........................................................................15

*McCullen v. Coakley*,
    573 U.S. 464 (2014)........................................................................20

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*,
    460 U.S. 575 (1983)............................................................17, 21, 25

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024)......................... 2, 4-5, 10, 14, 17, 26-28, 36-41, 43

*Nat'l Rifle Ass'n of Am. v. Vullo*,
    602 U.S. 175 (2024)........................................................................17

*NetChoice, L.L.C. v. Fitch,*
134 F.4th 799 (5th Cir. 2025)..........................................46, 52, 53, 54

*NetChoice, LLC v. Bonta,*
113 F.4th 1101 (9th Cir. 2024)..............................................21, 23, 49

*NetChoice, LLC v. Bonta,*
152 F.4th 1002 (9th Cir. 2025).........................................................49

*NetChoice, LLC v. Bonta,*
770 F. Supp. 3d 1164 (N.D. Cal. 2025) ......................................2, 31

*NetChoice, LLC v. Fitch,*
145 S. Ct. 2658 (2025).............................................................12, 56

*NetChoice, LLC v. Griffin,*
2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) ............... 17, 25, 46, 52, 53, 54

*NetChoice, LLC v. Griffin,*
2025 WL 978607 (W.D. Ark. Mar. 31, 2025)................. 2, 4, 14, 21, 23, 33, 40

*NetChoice, LLC v. Reyes,*
748 F. Supp. 3d 1105 (D. Utah 2024)........................... 2, 14, 18, 21, 23, 31, 46

*NetChoice, LLC v. Yost,*
778 F. Supp. 3d 923 (S.D. Ohio 2025)................... 2, 14, 16, 21, 31, 52, 53, 54

*Otto v. City of Boca Raton,*
981 F.3d 854 (11th Cir. 2020) ...................................................11, 33

*Packingham v. North Carolina,*
582 U.S. 98 (2017)...................... 1, 4, 6, 12, 14, 18-19, 22-23, 26, 37-39, 43, 57

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015)...........................................................10, 31, 32, 33

*S. River Watershed All., Inc. v. Dekalb Cnty.,*
69 F.4th 809 (11th Cir. 2023).......................................................46, 47

*Sable Commc'ns of Cal., Inc. v. FCC,*
  492 U.S. 115 (1989)..................................................................39

*Seminole Tribe of Fla. v. Florida,*
  517 U.S. 44 (1996)...................................................................14

\*Sorrell v. IMS Health Inc.,*
  564 U.S. 552 (2011)..............................................10, 28, 29, 30, 31

*State v. Wierson,*
  916 S.E.2d 389 (Ga. 2025).......................................................16

*Students Engaged in Advancing Tex. v. Paxton,*
  765 F. Supp. 575 (W.D. Tex. Feb. 7, 2025) ...............................2, 29

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency,*
  535 U.S. 302 (2002)..................................................................50

*TikTok Inc. v. Garland,*
  604 U.S. 56 (2025)............................................................34, 35

*Trump v. Boyle,*
  145 S. Ct. 2653 (2025).............................................................57

*Turner Broad. Sys., Inc. v. FCC,*
  512 U.S. 622 (1994)............................................................18, 34

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.,*
  517 U.S. 544 (1996)..................................................................47

*United States v. Edge Broad. Co.,*
  509 U.S. 418 (1993)..................................................................42

*United States v. Playboy Ent. Grp., Inc.,*
  529 U.S. 803 (2000)..................................................................21

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,*
  425 U.S. 748 (1976)..................................................................51

*Van Buren v. United States,*
593 U.S. 374 (2021)........................................................................19

*Virginia v. Am. Booksellers Ass'n, Inc.,*
484 U.S. 383 (1988)...................................................................52, 54

*Ward v. Rock Against Racism,*
491 U.S. 781 (1989).......................................................................20

*Wollschlaeger v. Governor of Fla.,*
848 F.3d 1293 (11th Cir. 2017) (en banc) ....................................24

*Wreal, LLC v. Amazon.com, Inc.,*
840 F.3d 1244 (11th Cir. 2016)......................................................55

*X Corp. v. Bonta,*
116 F.4th 888 (9th Cir. 2024).........................................................40

**Constitutional Provisions and Statutes**

47 U.S.C. § 230........................................ 1, 3, 9, 10, 44, 45, 46, 48

Cal. Civ. Code § 1798.140 ..............................................................30

O.C.G.A. § 13-3-20 ........................................................................20

O.C.G.A. § 39-5-5 ..........................................................................41

O.C.G.A. § 39-6-1 ............................ 6, 7, 10, 17, 31, 32, 33, 38, 39, 49

O.C.G.A. § 39-6-2 ...........................................1, 7, 8, 9, 16, 22

O.C.G.A. § 39-6-3 ...........................................1, 8, 10, 28, 29, 44

O.C.G.A. § 39-6-4 ............................................................................8

U.S. Const. amend. V .....................................................................50

**Other Authorities**

Appellee's Br., *NetChoice, L.L.C. v. Fitch*, No. 25-60348 (5th Cir.
Oct. 2, 2025), Dkt.40 ..............................................................................43

Br. of Appellees, *Comp. & Comms. Indus. Ass'n v. Att'y Gen.,*
*State of Florida*,
No. 25-11881 (11th Cir. Sept. 12, 2025), Dkt.27 ............ 13, 16, 17, 19, 52, 54

Dreamwidth, *Mississippi legal challenge: beginning 1 September,*
*we will need to geoblock Mississippi IPs* (Aug. 26, 2025),
https://perma.cc/G3E4-262C .............................................................56

Nextdoor, *Member Agreement* (Aug. 15, 2025),
https://perma.cc/NL3M-78PJ ............................................................56

## INTRODUCTION

The district court correctly enjoined Defendant's enforcement of Georgia Senate Bill 351's ("Act") speech restrictions: (1) parental consent for minors to access "social media" websites, § 39-6-2(c), (e); (2) age verification for *all* users to access those websites, § 39-6-2(a)-(b); and (3) restrictions on certain advertising practices, § 39-6-3(1).[1] These provisions violate the First Amendment, are unconstitutionally vague, and are preempted in part by 47 U.S.C. § 230.

"Minors are entitled to a significant measure of First Amendment protection," and the State's power to protect minors "does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) (cleaned up). The State thus lacks "power to prevent children from hearing or saying anything *without their parents' prior consent*." *Id.* at 795 n.3. Nor can the government age-gate fully protected speech, as "submitting to age verification is a burden on the exercise of" the First Amendment "right to access speech." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 482-83 (2025) ("*FSC*").

These principles apply equally online. Restricting "access to social media . . . prevent[s] the user from engaging in the legitimate exercise of First Amendment rights." *Packingham v. North Carolina*, 582 U.S. 98, 108 (2017).

---

[1] This brief uses "websites" to refer to all websites and applications. Unless otherwise noted, statutory citations refer to the Georgia Code.

The district court correctly maintained the status quo and preserved Georgians' continued access to the "staggering amount" of fully protected speech on these websites during this litigation. *Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024). This decision joined courts nationwide that have preliminarily or permanently enjoined enforcement of similar laws. *Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, 2025 WL 1570007 (N.D. Fla. June 3, 2025); *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923 (S.D. Ohio 2025); *NetChoice, LLC v. Griffin*, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025) ("*Griffin II*"); *NetChoice, LLC v. Bonta*, 770 F. Supp. 3d 1164 (N.D. Cal. 2025); *Students Engaged in Advancing Tex. v. Paxton*, 765 F. Supp. 575 (W.D. Tex. Feb. 7, 2025) ("*SEAT*"); *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011 (W.D. Tex. 2024) ("*CCIA*"); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105 (D. Utah 2024).

This Court should affirm.

## STATEMENT OF THE ISSUES

1. Whether the district court properly maintained the status quo and preserved Georgians' access to billions of pieces of fully protected online speech by preliminarily enjoining the Act's age-verification, parental-consent, and advertising restrictions under the First Amendment, Due Process Clause, or 47 U.S.C. §230.

2. Whether NetChoice's associational standing to challenge the Act also allows NetChoice to assert the interests of its members' users.

## STATEMENT OF THE CASE

### A. Factual background

### 1. Regulated websites disseminate vast amounts of fully protected expression.

NetChoice is an internet trade association. Dkt.5-3 at 1-2. The Act regulates some websites operated by NetChoice members, including: (1) Dreamwidth; (2) Meta (Facebook and Instagram); (3) Nextdoor; (4) Pinterest; (5) Reddit; (6) Snap Inc. (Snapchat); (7) X; and (8) YouTube. Dkt.5-3 at 11-12.[2]

The Act regulates these NetChoice members, and other covered "social media" websites, based on their dissemination and facilitation of user-generated speech. The Act restricts speech on websites that allow users

---

[2] Since preliminary-injunction briefing, new members have joined NetChoice that likely have covered websites, such as Tumblr. Nothing distinctive about these websites alters the First Amendment analysis.

"to share [content] with others" who can then "react to it, comment on it, or share it themselves." *Moody*, 603 U.S. at 719.

Each of these websites "engage[s] in expression" by "display[ing]" "distinctive expressive offering[s]" of "third party speech," according to their respective "community guidelines." *Id.* at 716-17, 738, 744 (cleaned up).

These websites also facilitate *user* speech. On covered websites, "users can debate religion and politics with their friends and neighbors[,] share vacation photos," or "petition their elected representatives." *Packingham*, 582 U.S. at 104. For instance, "[m]inors, who cannot vote for the lawmakers that represent them, can use social media to make their voices heard." *Griffin II*, 2025 WL 978607, at *13.

Consequently, the Supreme Court has called these kinds of websites (1) "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard" and (2) among the "principal sources for knowing current events." *Packingham*, 582 U.S. at 107. They disseminate "staggering" amounts of speech protected for both adults and minors. *Moody*, 603 U.S. at 719, 734.

## 2. Parents have many tools to oversee how their children use the internet and covered websites.

The district court found that there are many "tools to assist parents in managing their children's social media use." Dkt.34 at 42. Parents control minors' access to *devices* like smartphones and the settings of those devices, including usage limits and access to specific apps, websites, or content.

4

Dkt.5-3 at 7-9. Parents also control the *networks* minors use. Wireless routers and many internet service providers allow parents to manage minors' access to the internet and to set up rules defining which websites minors can use (and at what times). Dkt.5-3 at 8-9. Parents also control *software*. Web browsers offer parental controls. Dkt.5-3 at 10. And third-party parental-control software is available for many devices. Dkt.5-3 at 9.

In addition, many members have developed their own parental controls and protections for minors. *E.g.*, Dkt.5-3 at 6, 10-11; Dkt.5-4 at 15-20; Dkt.5-5 at 4-16; Dkt.5-6 at 6. These controls supplement members' "content-moderation" policies, which aim to prevent harmful or objectionable speech from reaching users. *E.g.*, Dkt.5-3 at 7; Dkt.5-4 at 20-26; Dkt.5-5 at 16-21; Dkt.5-6 at 15-19. Members' efforts have been successful at removing such content before many—if any—users view it. Dkt.5-3 at 7; Dkt.5-5 at 18-19. For instance, "[i]n a single quarter of 2021, Facebook removed from its News Feed more than 25 million pieces of 'hate speech content' and almost 9 million pieces of 'bullying and harassment content.' Similarly, YouTube deleted in one quarter more than 6 million videos violating its Guidelines." *Moody*, 603 U.S. at 738-39 (citations omitted).

### 3. Many websites advertise to make their services available for free.

Most covered websites depend on ads to remain freely available to users. Dkt.5-3 at 17; Dkt.5-4 at 3. Personalized and contextual advertising helps advertisers display ads to users most likely to be interested, rather than

blanketing users indiscriminately. Dkt.5-3 at 16-17. For example, a user who visits a National Park's social media account might see ads for camping equipment on that page. This spares users from seeing ads for products or services that would be of little interest to them. Account holders use websites for advertising, too, for everything from bake sales to babysitting services. Dkt.5-3 at 16-17.

**B. Georgia Senate Bill 351**

**1. Covered actors and activities. § 39-6-1(6).** The Act regulates a content-based subset of "social media" websites, which people have a right to "access" free from governmental restraint. *Packingham*, 582 U.S. at 107.

Specifically, the Act regulates "[s]ocial media platform[s]": any "online forum that allows an account holder to create a profile, upload posts, view and listen to posts, form mutual connections, and interact publicly and privately with other[s]." § 36-6-1(6).[3] These are precisely the kinds of "social media" websites protected by the Supreme Court in *Moody* and *Packingham*.

Within this category of covered "social media," the Act excludes websites based on their content. Specifically, it excludes websites with the following "predominant or exclusive function[s]": "[n]ews, sports, entertainment," "streaming service[s]," "[i]nteractive gaming,"

---

[3] A "[p]ost" is "content that an account holder makes available on a social media platform for other account holders or users to view or listen to, including text, images, audio, and video." § 39-6-1(5).

"[p]hotograph editing" and "associated photograph hosting," "[s]ingle purpose community groups for public safety," "professional networking," "data visualization," "digital news," "technical support," "[a]cademic, scholarly, or genealogical research," "classified advertising," and websites "used by or under the direction of an educational entity." § 36-6-1(6).

The Act also encourages websites to exclude minors younger than 16: It exempts any website that "does not permit minors to use the platform and . . . deter[s] minors from becoming account holders." § 39-6-1(6)(B). A "[m]inor" is "an individual who resides in this state and is actually known or reasonably believed by a social media platform to be under the age of 16." § 39-6-1(3).

**2. The Act's speech regulations.** The Act regulates speech in multiple ways.

*Parental-consent. § 39-6-2(c), (e).* Covered websites "shall" not "permit a minor to be an account holder unless" the website "obtains the express consent of such minor's parent or guardian." § 36-6-2(c). On covered websites, users must have an account to access some or all of the protected speech and speech-enabling functions. Dkt.5-3 at 13-14; Dkt.5-4 at 3-4; Dkt.5-6 at 3-5. The Act provides five enumerated "methods of obtaining express consent" and one catch-all for "[a]ny other commercially reasonable method." § 36-6-2(c)(6).

*Age-verification. § 39-6-2(a)-(b).* Covered websites "shall make commercially reasonable efforts to verify the age of account holders with a

level of certainty appropriate to the risks that arise from the [websites']
information management practices." § 39-6-2(a). If they do not, they must
treat *all* users as minors for purposes of the Act. *Id.*

*Advertising. § 39-6-3(1).* "For a minor account holder," covered websites
"shall prohibit . . . [t]he display of any advertising . . . based on such minor
account holder's personal information, except age and location." § 39-6-3(1).

*Limitation on information collection and use. § 39-6-3(2).* The Act also
"prohibit[s]" the "collection or use of personal information from the posts,
content, messages, text, or usage activities of the minor account holder's
account other than what is adequate, relevant, and reasonably necessary for
the purposes for which such information is collected, as disclosed to the
minor." § 39-6-3(2).

*Enforcement and penalties.* The Act gives Defendant "exclusive"
enforcement authority. § 39-6-4(a). Among other things, Defendant may seek
$2,500 per violation in damages. § 39-6-4(c).

## C. Procedural history

NetChoice sued and moved for preliminary injunctive relief on May 1,
2025—two months before the Act's July 1, 2025, effective date. Dkt.1. This
followed the 2025 Georgia legislative session, in which the Legislature
declined to amend or repeal the Act.

The district court preliminarily enjoined Defendant's enforcement of the
Act against NetChoice's members on June 26, 2025. The court first ruled that
NetChoice has both associational standing for Article III jurisdiction *and*

prudential standing to raise its members' *users'* interests. Dkt.34 at 7-15. Then, the district court concluded that the Act's restrictions are likely facially unconstitutional under the First Amendment. Dkt.34 at 19-42. The district court also held that the Act's requirements for "commercially reasonable" age verification are unconstitutionally vague and that the Act's advertising restrictions are preempted by 47 U.S.C. § 230. Dkt.34 at 43-45.

## SUMMARY OF THE ARGUMENT

**I.** NetChoice is likely to prevail on the merits of its claims that the Act's speech restrictions are content-based regulations of speech, failing any form of heightened First Amendment scrutiny.

**A.** The Act unconstitutionally requires websites to secure parental consent before permitting minors to create accounts. § 39-6-2(c), (e). This violates Supreme Court precedent, holding that governments cannot require minors to obtain their "*parents' prior consent*" to engage in or receive protected speech. *Brown*, 564 U.S. at 795 n.3.

**B.** The Act impedes *all* users' access—minors and adults—to covered websites by requiring users to "verify the[ir] age[s]" to become "account holder[s]" and access fully protected speech on covered websites. § 39-6-2(a)-(b). *FSC* held that "submitting to age verification is a burden on the exercise of" the "right to access speech" and subject to "strict scrutiny" when it "target[s] . . . *fully protected* speech." 606 U.S. at 482-84 (emphasis added). In addition, the district court correctly concluded that the requirement for "commercially reasonable" age verification is unconstitutionally vague.

**C.** The Act's prohibitions on advertisements based on most "personal information" on minors' accounts, § 39-6-3(1), unconstitutionally restricts websites' use of information in disseminating speech and their editorial control over the arrangement and presentation of third-party speech. *See Moody*, 603 U.S. at 728; *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011); *SEAT*, 765 F. Supp. 3d at 598-99.

**D.** The Act targets websites for regulation based on content, which is an independent reason to subject the Act's speech restrictions to strict First Amendment scrutiny. The Act selects covered websites for regulation based on the "subject matter" disseminated on the websites, and thus their "content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citation omitted). For example, the Act excludes many websites because of their content—such as "[n]ews, sports, entertainment," "[i]nteractive gaming," "community groups for public safety," and "professional networking." § 36-6-1(6). It also favors websites that include "content that is preselected" and "not user generated." § 39-6-1(6)(D).

**E.** The district court correctly concluded that the Act's speech regulations are facially unconstitutional. At a minimum, the district court's judgment can be upheld under NetChoice's as-applied challenges.

**II.** The Act's advertising restrictions are also preempted by 47 U.S.C. § 230. They would penalize websites for exercising "editorial functions" over third-party content, such as "decisions relating to the monitoring, screening,

and deletion of content." *A.B. v. Salesforce, Inc.*, 123 F.4th 788, 793, 797 (5th Cir. 2024) (cleaned up).

**III.** NetChoice has both Article III associational standing to raise its member websites' rights *and* prudential standing to raise the interests of members' users—as multiple courts have held.

**IV.** NetChoice's "likelihood of success on the merits" means "the remaining requirements" for preliminary injunctive relief "necessarily follow." *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1283 (11th Cir. 2024). The loss of First Amendment freedoms is irreparable injury. And preventing the balkanization of the internet and ensuring that NetChoice's members may continue disseminating speech to Georgians serves the public interest.

## STANDARD OF REVIEW

The district court correctly concluded that NetChoice demonstrated: (1) "likelihood of success on the merits"; (2) "irreparable injury"; and (3-4) that the balance of the equities and "public interest" support preliminary injunctive relief. *Otto v. City of Boca Raton*, 981 F.3d 854, 860 (11th Cir. 2020).

## I. NetChoice is likely to succeed on the merits of its First Amendment and vagueness claims.

The district court correctly concluded that NetChoice is likely to succeed on the merits of its facial First Amendment claims. Dkt.34 at 19-42. District courts across the county have concluded that similar requirements violate the First Amendment. *See supra* p.2. And Justice Kavanaugh recognized that another State's similar requirements "would likely violate [NetChoice] members' First Amendment rights." *NetChoice, LLC v. Fitch*, 145 S. Ct. 2658, 2658 (2025) (Kavanaugh, J., concurring in denial of application to vacate stay). This case is no different.

Because the Act's speech regulations "target[] . . . fully protected speech," they trigger "[s]trict scrutiny." *FSC*, 606 U.S. at 484. Defendant must therefore show that the State has "[1] adopt[ed] the least restrictive means of [2] achieving a compelling state interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) ("*AFP*") (cleaned up). At a minimum, governmental restrictions on "access" to "social media" websites trigger "intermediate scrutiny" and must be "narrowly tailored to serve a significant governmental interest." *Packingham*, 582 U.S. at 105-06 (citation omitted). Under either form of scrutiny, "[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (citation omitted). The State cannot carry that burden.

## A. The Act's parental-consent requirements violate the First Amendment by restricting minors' access to fully protected speech.

### 1. The Act's parental-consent requirements regulate speech.

**a.** The First Amendment prohibits the Act's parental-consent requirements for websites to disseminate fully protected speech to minors. *See Brown*, 564 U.S. at 795 n.3; Dkt.34 at 28-29; Br. of Appellees at 22-24, *Comp. & Comms. Indus. Ass'n v. Att'y Gen., State of Florida*, No. 25-11881 (11th Cir. Sept. 12, 2025), Dkt.27 ("NetChoice.Fla.Br."). Such laws limit both websites' dissemination of speech and minors' ability to engage in speech.

*Brown* held that minors have the "right to speak or be spoken to," and governments lack "the power to prevent children from hearing or saying anything *without their parents' prior consent*." 564 U.S. at 795 n.3. "[M]inors are entitled to a significant measure of First Amendment protection." *Id.* at 794 (cleaned up). So "only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to [minors]." *Id.* (cleaned up). Conditioning minors' ability to receive protected speech on securing parental consent is impermissible, whether that speech is "political," "religious," or content the State disfavors. *Id.* at 795 n.3. *Brown* therefore invalidated a law prohibiting the "sale or rental" of "violent video games" to minors. *Id.* at 789.

These First Amendment rights extend online and "the First Amendment . . . does not go on leave when social media are involved."

*Moody*, 603 U.S. at 719. The Supreme Court has thus held that restricting "access to social media ... prevent[s] the user from engaging in the legitimate exercise of First Amendment rights." *Packingham*, 582 U.S. at 108.

Since *Brown* and *Packingham*, every court that has considered similar online parental-consent requirements and reached the merits has enjoined those laws' enforcement. Parental-consent laws in Arkansas and Ohio have been permanently enjoined. *Griffin II*, 2025 WL 978607, at *8, *17; *Yost*, 778 F. Supp. 3d at 954-57, 959. Similar requirements are preliminarily enjoined in Florida, *Uthmeier*, 2025 WL 1570007, *15, *21, and Utah, *Reyes*, 748 F. Supp. 3d at 1126 & n.135, 1134.

Georgia's materially identical parental-consent requirements violate the First Amendment for the same reasons. As Defendant agrees, they determine whether "the minor [can] enter the website." AG.Br.34. So minors who wish to create accounts to discuss their political views could not do so unless one of their parents first consent. For minors who cannot secure parental consent, the Act is "an outright ban on speech." *Contra* AG.Br.36; *see Griffin II*, 2025 WL 978607, at *13.

**b.** Defendant's responses are unavailing. AG.Br.32-38.

First, Defendant improperly dismisses *Brown*. He calls the Supreme Court's discussion of minors' rights "dicta." AG.Br.47. Yet those rights were "necessary to" *Brown*'s holding. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996). If minors lacked the right to "be spoken to" without parental consent, restricting minors' access to video games would not have triggered

First Amendment scrutiny at all. *Brown*, 564 U.S. at 795 n.3. That was *the* dispute between *Brown*'s majority and dissent. *Id.* Besides, "[e]ven if the relevant language in [a Supreme Court opinion] is dicta," this Court is "obligated to respect it." *Henderson v. McMurray*, 987 F.3d 997, 1006 (11th Cir. 2021).

Nor can *Brown* be dismissed as involving only "a content-based, outright ban on the sale of certain speech." AG.Br.36. The law there was not an outright ban: It allowed minors to possess and play violent video games *with parental consent*. *Brown*, 564 U.S. at 795 n.3, 802. More broadly, *Brown*'s rationale cannot be limited to only content-based regulations of speech. The law in *Brown* would have been *worse* if it prohibited the sale of *all* video games to minors. In any event, this Act *is* content-based. *See infra* pp.31-36.

Applying *Brown* does not mean that "when parents use parental controls . . . , the minor child could sue the parent to override the decision." AG.Br.46. The First Amendment prohibits only *governmental* restrictions. *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 804 (2019). NetChoice and its members support parents' authority to use available tools (including tools supplied by members) to oversee their minor children online. But this law improperly "impose[s] *governmental* authority, subject only to a parental veto." *Brown*, 564 U.S. at 795 n.3.

Second, the Act does not regulate mere "contracts." AG.Br.32-35; States.Br.13-15. Even if it did, that is not a basis to evade First Amendment scrutiny. The district court and other courts have correctly rejected similar

arguments. Dkt.34 at 23-24; *Uthmeier*, 2025 WL 1570007, at *11; *Yost*, 778 F. Supp. 3d at 948-49; *see* NetChoice.Fla.Br.33-36.

The Act's parental-consent requirements do not use the word "contract." Rather, they restrict "permit[ting] a minor to be an account holder." § 36-6-2(c). Courts "may not read into a statute language that the General Assembly did not enact." *State v. Wierson*, 916 S.E.2d 389, 394 (Ga. 2025).

Nevertheless, Georgia cannot evade First Amendment scrutiny by inserting the word "contract" into a law restricting speech. *Brown* itself rejected the "notion that regulations of speech can withstand strict scrutiny when disguised as regulations of contract—even if those contracts are being entered into by minors." Dkt.34 at 24 (citing *Brown*, 564 U.S. at 786). The law in *Brown* regulated a commercial transaction: "the *sale* or *rental* of 'violent video games.'" 564 U.S. at 789 (emphases added). The Court held States cannot "punish[] the sale or rental" of protected speech, any more than they can restrict "the writing" of protected speech. 564 U.S. at 792 n.1.

Unsurprisingly, "Defendant does not cite any case in which the regulation of a contract made for the purpose of accessing speech was found to lie outside the ambit of the First Amendment." *Uthmeier*, 2025 WL 1570007, at *11. This theory would extend beyond parental-consent requirements and could allow the State to prohibit *adults* from creating accounts on these websites.

As this Court has held, States cannot "ban a protected activity" by "procee[ding] upstream" to "dam the source." *Buehrle v. Key West*,

813 F.3d 973, 977 (11th Cir. 2015); *see Citizens United v. FEC*, 558 U.S. 310, 336 (2010) (similar). Nor can governments exercise their general authority to regulate contracts to specifically target speech. The State "cannot do indirectly what [it] is barred from doing directly." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024). For instance, governments have unquestioned power to tax, but governments cannot levy taxes on only specific publishers. *See Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 591 (1983) (rejecting tax that "target[ed] a small group of newspapers"). So too here: The Act's restrictions on protected speech trigger First Amendment scrutiny even if they are framed as restrictions on "contracting" and regardless of whether they outright ban speech. *Contra* AG.Br.37-38. "[F]or *fully protected speech*, 'the distinction between bans and burdens makes no difference.'" *FSC*, 606 U.S. at 493 n.12 (cleaned up).

Third, the Act does not regulate minors' access to mere "locations." AG.Br.34-35, 36-37, 47. It restricts access to "billions of posts" of fully protected speech. *Moody*, 603 U.S. at 734. This Act targets minors' access to a content-based subset of websites where users can "upload posts, view and listen to posts"—that is, to speak. § 36-6-1(6). So Defendant's analogies to places like bars are "weak." *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *16 (W.D. Ark. Aug. 31, 2023) ("*Griffin I*"); *see* NetChoice.Fla.Br.36. Covered websites "are in the business of expression, while [bars] are in the business of selling" alcohol. *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 761 (1988). Unlike *Indigo Room* and *Gary* (cited by Defendant), therefore, the

speech burdens imposed by the Act here are not merely "incidental[]" to an otherwise-valid regulation on places (*e.g.*, bars) minors have no right to go. *Indigo Room, Inc. v. Fort Myers*, 710 F.3d 1294, 1300 (11th Cir. 2013); *Gary v. City of Warner Robins*, 311 F.3d 1334, 1340 (11th Cir. 2002).

### 2. The Act's parental-consent requirements fail any form of heightened First Amendment scrutiny.

Because the Act's parental-consent requirements "target[] . . . fully protected speech," they trigger and fail "[s]trict scrutiny." *FSC*, 606 U.S. at 484; *see Brown*, 564 U.S. at 795 n.3. Defendant does not argue they satisfy strict scrutiny. Even under intermediate scrutiny, they "burden substantially more speech than is necessary." *Packingham*, 582 U.S. at 106 (citation omitted).

**a.** Defendant has not established a sufficient governmental interest in restricting access to protected speech. The government's general interest in protecting minors, *cf.* AG.Br.43, does not entail "a free-floating power to restrict the ideas to which children may be exposed," *Brown*, 564 U.S. at 794-95 (cleaned up).

Under both intermediate and strict scrutiny, the government also must demonstrate "an actual problem in need of solving" *by the government*. *Brown*, 564 U.S. at 799 (cleaned up); *see Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664-65 (1994). Defendant has "not provided evidence establishing a clear, causal relationship between minors' social media use and negative mental health impacts." *Reyes*, 748 F. Supp. 3d at 1125

(evaluating similar record). Regarding the "effects of social media," Dr. Kaliebe's declaration here admits that "some reviews have found small, mixed, or no clear overall effects." Dkt.23-1 at 19. And "[n]early all of the research" cited by Defendant "is based on correlation, not evidence of causation." *Brown*, 564 U.S. at 800 (citation omitted); Dkt.23-1 at 18-20, 22, 27-30 ("appears"; "meta-correlation"; "connection"; "linked to"; "associated with"; "seem to"; "could be"; "positive associations"; "correlates"; "well-documented associations"; "[c]orrelational studies").

Defendant's factual assertions also are based on only a handful of covered websites—not the many websites regulated by the Act, or even all NetChoice members. *E.g.*, Dkt.23-1 at 11, 24; *see* States.Br.6-12. Further afield, Dr. Kaliebe cites the purported effects of technology unregulated by the Act, like smartphones and the broader internet. *E.g.*, Dkt.23-1 at 35-36.

In addition, the Act's "[u]nderinclusiveness," as a purported regulation of mere contracts, "raises serious doubts about whether the government is in fact pursuing the interest it invokes." *Brown*, 564 U.S. at 802. "[T]erms of service" are ubiquitous online. *Van Buren v. United States*, 593 U.S. 374, 394 (2021). Yet this Act regulates only creating "social media" accounts on a subset of websites.

**b.** The Act's parental-consent requirements fail intermediate scrutiny because they "burden substantially more speech than is necessary." *Packingham*, 582 U.S. at 106 (citation omitted); *see* NetChoice.Fla.Br.30-33. So

they necessarily fail strict scrutiny, as the district court concluded. Dkt.34 at 27-42.

Under intermediate scrutiny, the "[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989).

Consider the interest in preventing harms to minors. As explained above, the record shows the Act is not limited to websites that are purportedly harmful to minors or even likely to be accessed by minors. Rather, Georgia has restricted access to enormous amounts of protected speech on many websites based on a concern that *some* uses of *some* websites *sometimes* may harm *some* minors.

The Act is also "seriously overinclusive" as a purported regulation of contracts. *Brown*, 564 U.S. at 805. Its remedy for lack of parental consent is to restrict minors' access to vast amounts of speech, rather than imposing any traditional contractual remedy. If Georgia were concerned about specific contractual terms (*e.g.*, arbitration agreements), it could have regulated those terms or relied on voidability of contracts by minors. § 13-3-20(a); AG.Br.32-33. Defendant's brief highlights Georgia's many preexisting statutes regulating contracts. AG.Br.33.

Whatever the governmental interest, Defendant has not "demonstrate[d] that alternative measures that burden substantially less speech would fail to achieve the government's interests." *McCullen v. Coakley*, 573 U.S. 464, 495

(2014). Parents already have many options to oversee their children online. "Most minors cannot access social media without a parent-funded device and internet connection, and 'parents who care about the matter' have many tools at their disposal." *Griffin II*, 2025 WL 978607, at *14 (quoting *Brown*, 564 U.S. at 803). Georgia could alternatively give "parents the information needed to engage in active supervision" over their children's internet access. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 826 (2000); *accord NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024); *Griffin II*, 2025 WL 978607, at *13; *Yost*, 778 F. Supp. 3d at 956; *Reyes*, 748 F. Supp. 3d at 1127; *see supra* pp.4-5. These are precisely the kinds of tools the Supreme Court has endorsed over governmental intervention, yet Georgia ignored them. *See, e.g.*, *Ashcroft v. ACLU*, 542 U.S. 656, 666-67 (2004); *Playboy*, 529 U.S. at 826.

Furthermore, members' self-regulation is extensive, as covered websites already engage in substantial content moderation (including providing age-appropriate experiences) and offer parental controls. *See supra* p.5. The Supreme Court has recognized that "voluntary" self-regulatory efforts are preferable to government intervention. *Brown*, 564 U.S. at 803.

Finally, it does not matter that the Act purportedly allows compliance flexibility through "commercially reasonable" parental-consent methods. *Contra* AG.Br.45. Governmental speech restrictions do not become constitutional just because a company can "bear the burden" of compliance. *Minneapolis Star*, 460 U.S. at 591-92; *Citizens United*, 558 U.S. at 350 (similar).

This is abundantly clear from the perspective of *users*. *Any* form of state-mandated parental consent violates minors' rights to access speech "*without their parents' prior consent*." *Brown*, 564 U.S. at 795 n.3. *Brown* would not have come out differently had California asked for just "commercially reasonable" efforts to block minors from buying violent video games. *Id.* at 795 n.3, 802. Nor could North Carolina have asked for "commercially reasonable" efforts to block certain users. *Packingham*, 582 U.S. at 107-08.

To be sure, it can be an *aggravating* factor if certain websites' compliance with the Act would require "Herculean" efforts. AG.Br.45. The undisputed evidence shows that for some websites, compliance with the Act's speech restrictions would be "far in excess of [the] available budget," if not "impossible." Dkt.5-6 at 7, 13, 20. But it need not be impossible to comply with speech restrictions for a law to violate the First Amendment.

## B. The Act's age-verification requirements violate the First Amendment and Due Process Clause.

### 1. The Act's age-verification requirements trigger heightened First Amendment scrutiny and are unconstitutionally vague.

**a.** The Act also violates the First Amendment by requiring websites "to verify the age of account holders"—including both adults and minors. § 39-6-2(a). This burdens threshold access to "what for many are the principal sources for knowing current events." *Packingham*, 582 U.S. at 107.

*FSC* held that "submitting to age verification is a burden on the exercise of" the "right to *access* speech" protected by the First Amendment. 606 U.S. at 482-83 (emphasis added). At the same time, "age-verification requirements 'impose costs' *on speakers*." *HM Florida-ORL, LLC v. Gov. of Fla.*, 137 F.4th 1207, 1239 (11th Cir. 2025) (emphasis added) (citation omitted).

The First Amendment does not allow the government to require that people prove their ages before they can access "the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham*, 582 U.S. at 107. Every court to have resolved this issue on the merits has enjoined enforcement of similar age-verification requirements to access "social media." *E.g.*, *Griffin II*, 2025 WL 978607, at *8; *Reyes*, 748 F. Supp. 3d at 1129 n.169; *see Bonta*, 2025 WL 807961, at *22.

Yet under Georgia's Act, any minor or adult must verify her age to discuss the gubernatorial election or Georgia football on a covered website. Defendant's own declaration shows that age verification would require providing some form of personal-identification materials, raising substantial speech-chilling concerns. *See* Dkt.23-2 at 10 ("drivers' licenses, passports, electoral rolls, credit reports, cellphone-network records, banking, [] credit-card records[,] . . . facial images, voiceprints").

**b.** The district court also correctly recognized that the Act's statutory qualifier for "commercially reasonable" age-verification requirements is

unconstitutionally vague. Dkt.34 at 43-44.[4] Regulated websites have no idea where along the sliding scale of "commercially reasonable" they fall, and thus how precisely to verify the ages of their users.

Under the vagueness doctrine, laws must "give fair notice of conduct that is . . . required" to prevent "discriminatory enforcement." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (cleaned up). Relevant here, "[s]tandards of permissible statutory vagueness are strict in the area of free expression" to prevent chilling speech, so laws restricting speech can be facially vague even if they are not vague in all applications. *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1320 (11th Cir. 2017) (en banc) (citation omitted).

Here, "the Act's amorphous requirement of 'commercially reasonable' age verification efforts" would result in "disparate enforcement." Dkt.34 at 43-44. As a result, it fails to provide an "ascertainable standard of conduct." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964). The Act "would incentivize social media platforms to err toward the side of caution to avoid liability. The most cautious option, it seems, would be to collect government-issued

---

[4] Although the district court raised this issue sua sponte, this is unlike the situation in *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 980 (11th Cir. 2005); *contra* AG.Br.51. Here, NetChoice has challenged the Act's age-verification requirements and argued that its disparate application raises constitutional problems. Dkt.5-1 at 15.

identification." Dkt.34 at 31. That is the method imposing the greatest speech-chilling concerns. *See supra* p.23.

Defendant protests that "reasonableness" requirements are widespread. AG.Br.52-53 & n.6. Yet this Act is unlike the examples Defendant collects relating to commercial regulation of *non-expressive conduct*. This Act determines the means to restrict threshold access to speech. And "[w]hen speech is involved, rigorous adherence to" the vagueness doctrine's "requirements is necessary." *Fox*, 567 U.S. at 253-54.

Even if not unconstitutionally vague, the First Amendment prohibits governments from imposing disparate requirements on publishers based on their perceived "ab[ility] to bear the burden." *Minneapolis Star*, 460 U.S. at 592. Here, therefore, if the Act imposes different age-verification requirements on different websites, that unconstitutionally unequal treatment is an alternative basis to uphold the district court's decision.

## 2. The Act's age-verification requirements fail any form of heightened First Amendment scrutiny.

Age verification effectuates the Act's other age-based restrictions, such as the parental-consent requirement. Because those other provisions are unconstitutional, age-verification serves no standalone governmental interest. *See, e.g., Griffin I*, 2023 WL 5660155, at *18-21. The Act's age-verification requirements fail intermediate and strict scrutiny for all the reasons discussed above at pp.18-22.

The age-verification requirements independently fail even intermediate scrutiny for additional reasons. They "burden substantially more speech than is necessary." *Packingham*, 582 U.S. at 106. The Act uses age verification to restrict *all* users' access—*adults* included—to "billion[s]" of posts of fully protected speech. *Moody*, 603 U.S. at 719. Plus, for websites that cannot verify the ages of their users, those websites must treat all adults on the websites as minors. *See supra* p.8. That would unconstitutionally "reduce the adult population . . . to reading only what is fit for children." *Butler v. Michigan*, 352 U.S. 380, 383 (1957).

The tailoring analysis here is not controlled by *FSC*, because *FSC* did not concern age-verification requirements to access *fully protected* speech for both minors and adults. *Contra* AG.Br.44. Instead, *FSC* concerned a law targeting "pornography." 606 U.S. at 466. Pornography is a unique speech category that is unprotected for minors ("obscene for minors'") yet simultaneously protected for adults. *Id.* at 473-74. *FSC* recognized that a different tailoring analysis would apply to restrictions on access to "fully protected speech." *Id.* at 484-85, 493 n.12. So *FSC* reflects only how intermediate scrutiny applies to age-verification requirements to access "pornography," which is *unprotected* speech for minors. *Id.* at 482, 487, 493 n.12.[5] Even there, *FSC* recognized that

<hr>

[5] For similar reasons, Amici States are wrong to suggest (States.Br.24-27) that *FSC* allows the government to restrict minors' access to fully protected speech lacking a "tradition of proscription," *Brown*, 564 U.S. at 792. The

age verification "necessarily" burdens the "right to access" that speech. 606 U.S. at 495. But because "pornography" is "unprotected *to the extent the State seeks only to verify age*," age verification for "pornography" will often satisfy heightened First Amendment scrutiny. *Id.* at 482 (emphasis added). When people must prove their age to determine whether speech is protected for them, then the age-verification process can be a "modest burden." *Id.* at 496. That is consistent with how access to pornography works "in the case of in-person access." *Id.*

By contrast, this Act's age-verification requirements restrict access to "billion[s]" of pieces of *fully protected* speech. *Moody*, 603 U.S. at 719. Accordingly, the Act impedes minors' and adults' from accessing speech they have a constitutional right to access. And these burdens are not necessary to determine whether the speech is constitutionally protected as to individual users. So such restrictions on fully protected speech lack "in-person" analogs grounded in history or tradition. *FSC*, 606 U.S. at 496. The government cannot require people to prove their ages before buying books or music. That is why the district court expressed its "grave concern" that "Georgians would have to submit government-issued identification to access a central forum for speech." Dkt.34 at 30; *contra* AG.Br.46.

---

government cannot "create new categories of unprotected speech," even for minors. *Id.*

The Act's statutory qualifier for "commercially reasonable" age-verification methods does not alleviate the speech burdens. *See supra* pp.21-22. *Any* form of "age verification" necessarily "burden[s]" *users'* "right" to access fully protected speech. *FSC*, 606 U.S. at 483, 495. Again, "for *fully protected speech*, 'the distinction between bans and burdens makes no difference.'" *Id.* at 493 n.12 (cleaned up).

## C. The Act's advertising restrictions violate the First Amendment.

**1.** The Act further violates the First Amendment by prohibiting the "display of any advertising" on minors' accounts based on "personal information, except age and location." § 39-6-3(1). The First Amendment prohibits States from dictating how private entities choose which lawful ads to publish—and what lawfully obtained information they use to make that choice. After all, the "selection of" an "advertisement for inclusion" in a "compilation of speech" "fall[s] squarely within the core of First Amendment security." *Hurley v. Irish-American Gay, Lesbian Bisexual Group*, 515 U.S. 557, 570 (1995); *see Moody*, 603 U.S. at 734, 738.

The Act also unconstitutionally restricts the use of lawfully obtained information for protected expression. The "right to speak is implicated when information [one] possesses is subjected to restraints on the way in which the information might be used." *Sorrell*, 564 U.S. at 568 (citation omitted). *Sorrell* invalidated a law prohibiting the use of "prescriber-identifying information" for purposes of pharmaceutical marketing. *Id.* at 564. The

Court rejected the idea that "use of . . . information [is] conduct" unprotected by the First Amendment. *Id.* at 570. Like the law in *Sorrell*, this Act restricts the use of lawfully obtained information—here, "personal information" beyond "age and location"—for protected expressive activities. § 39-6-3(1). Federal courts have recognized the constitutional infirmities in nearly identical provisions. *SEAT*, for example, enjoined enforcement of Texas's similar prohibition. 765 F. Supp. 3d at 598-99.

The Act's constitutional problems are exacerbated by its scope. The undefined term "personal information" sweeps in a vast array of information that could inform advertising, including information like a user's interests in sports, music, or academic subjects. Plus, the Act's undefined term "advertising" potentially encompasses user-generated promotional content. This could include everything from announcements about concerts to small-business promotions. Compliance with the Act thus would require covered websites to monitor user posts to determine whether they constitute "advertisements." Assuming such monitoring were possible (which is unlikely, Dkt.5-3 at 16-17), this would chill protected speech.

**2.** Strict scrutiny should apply because the Act targets websites' editorial control. *Hurley*, 515 U.S. at 570. And it does so based on the content of "personal information" used to display advertisements, "except[ing] *age and location*," § 39-6-3(1) (emphasis added). This provision could reach all manner of "advertisements" that do not "propose a commercial transaction," so "strict scrutiny applies." *SEAT*, 765 F. Supp. 3d at 594-95.

This advertising restriction cannot meet strict scrutiny. It is vastly overinclusive. Leaving "personal data" undefined restricts a broad range of ads. For instance, the Act is not limited to things like "sensitive personal information," regulated by other States. Cal. Civ. Code § 1798.140(ae). It does not serve any governmental interest to prohibit websites from publishing ads based on, *e.g.*, a user's search for tutoring services or college admissions. The Act is not limited to paid advertisements. And it could extend to any number of user-created promotions—*e.g.*, for pet-sitting, sports camps, or concerts—if that content is presented to users based on personal information.

Moreover, this restriction is "seriously underinclusive." *Brown*, 564 U.S. at 805. It "allows the information to be . . . used" for advertising "by all but a narrow class of disfavored speakers." *Sorrell*, 564 U.S. at 573; *id.* at 574-75. "Why . . . can a teenager view a targeted advertisement on a sports or shopping website but not on a social platform?" *SEAT*, 65 F. Supp. 3d at 599.

Even if construed as a regulation of just commercial speech, this law still fails intermediate scrutiny. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 570 (1980). The Act's "purpose to suppress speech and its unjustified burdens on expression would render it unconstitutional." *Sorrell*, 564 U.S. at 566. Ads that "accurately inform the public about lawful activity" are protected. *Cent. Hudson*, 447 U.S. at 563. This Act does not attempt to regulate false or misleading commercial speech.

Under intermediate scrutiny, the government must demonstrate a "substantial interest," that the Act "directly advances" that interest, and "is not more extensive than is necessary." *Id.* at 564, 566. The State has no legitimate interest in "protect[ing] the young from ideas or images that [it] thinks unsuitable." *Brown*, 564 U.S. at 795. That includes lawful ads. Nor may the State prohibit certain ads because they are considered "persuasive." *Sorrell*, 564 U.S. at 578. Additionally, prohibiting such advertising on only a handful of websites is an insurmountable tailoring problem. *Id.* at 573-75.

### D. All of the Act's speech regulations are content-based, so they all trigger and fail strict scrutiny.

**1.** The district court correctly concluded that the Act's "[s]ocial media platform" definition, §39-6-1(6), is content-based. Dkt.34 at 19-27. "Content-based laws ... are presumptively unconstitutional and may be justified only if the government proves" they satisfy "strict scrutiny." *See Reed*, 576 U.S. at 163-64. Multiple courts have held that similar coverage provisions are content-based. *See Yost*, 778 F. Supp. 3d at 954; *Bonta*, 770 F. Supp. 3d at 1191 (collecting cases); *Reyes*, 748 F. Supp. 3d at 1120.

If "a statute's gateway coverage definition is content-based, the statute as a whole is subject to strict scrutiny because the coverage definition applies in all applications of the statute." *Bonta*, 770 F. Supp. 3d at 1191 (collecting

cases).[6] Here, the Act defines its scope based on websites' "subject matter" and thus their "content." *Reed*, 576 U.S. at 163.[7]

The Act's central coverage definition is content-based because it favors websites that include "content that is preselected" and "not user generated." § 39-6-1(6)(D). In contrast, the Act burdens similar websites that disseminate user-generated content, even if those websites also post or create their own content.

In addition, the Act outright exempts the State's favored entities based on the content they disseminate—such as "[n]ews, sports, entertainment," "interactive gaming," "public safety," "professional networking," and "[a]cademic, scholarly, or genealogical research" websites. § 39-6-1(6). "The elevation of news, sports, commerce, and provider-generated content over user-generated content is a content-based regulation." *CCIA*, 747 F. Supp. 3d at 1032. These exclusions likewise subject the Act to strict scrutiny. *See Barr v. Am. Ass'n of Pol. Consultants*, 591 U.S. 610, 620-21 (2020) (controlling

_____

[6] The information-collection and information-use limitation is a "[g]overnment regulation of speech" because it imposes legal duties on covered websites if they disseminate speech of a certain type of "content." *Reed*, 576 U.S. at 163.

[7] Whether these are content-based distinctions or speaker-based distinctions that "reflect[] a content preference," strict scrutiny applies all the same. *Reed*, 576 U.S. at 170.

plurality op.) (content-based exceptions render statute content-based); *contra* AG.Br.41 n.5.

**2.** Defendant's arguments fail to demonstrate that the Act's coverage definition is content-neutral.

Defendant erroneously contends that "the substantive message is irrelevant to the application of the law." AG.Br.39 (citation omitted). To the contrary, a "website operating in [Georgia]" or "an enforcement official . . . cannot determine whether the website is regulated without looking to the content posted on that website." *Griffin II*, 2025 WL 978607, at *9.

Defendant then suggests that this Court should ignore the statute's facially content-based distinctions and instead examine the government's "reasons" or motives. AG.Br.38. But if a law is "content based on its face," it "is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Reed*, 576 U.S. at 165 (citation omitted); *Otto*, 981 F.3d at 862 (same).

When Defendant addresses the Act's content-based exceptions, he argues that the Act "excludes websites with certain *functions*." AG.Br.38-39; States.Br.19-23. But these exceptions list content-based categories of speech—like "news, sports, [and] entertainment," § 39-6-1(6)(D)—not just website functions. *E.g.*, *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993) ("news" is content-based). Perhaps the "cloud storage" exception may not be content-based. But Defendant does not attempt to

explain how many of the Act's other exceptions are content-neutral. Plus, governments cannot "swap[] an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 74 (2022).

Defendant's contention that the Act regulates mere "locations" is similarly flawed. AG.Br.39. Assuming that online publications can be characterized as "locations," governments lack the power to decide which locations to regulate based on the content they disseminate. Defendant's analogy to "arenas" proves the point. AG.Br.39. Governments cannot regulate only those arenas disseminating specific kinds of speech—for instance, regulating arenas that feature comedy shows while excluding country music venues. Similarly, Defendant's analogy to "restricting access to the video game store" is instructive. AG.Br.36-37. If the State were to restrict minors' access to only video game stores, it would need to demonstrate that the restriction is properly tailored to address the State's concern that "dangerous people are inside." AG.Br.37.

Because the Act selects its regulated speakers based on content, this Act is nothing like the coverage provisions in *TikTok Inc. v. Garland*, 604 U.S. 56 (2025), or *Turner*; *contra* AG.Br.41-42; States.Br.21.

In *Turner*, "Congress . . . required cable operators to provide carriage to broadcast stations." 512 U.S. at 659. *Turner* held that law's coverage provision singling out cable television operators (*i.e.*, speakers) *without* reference to the content they transmitted was "content neutral." *Id.* at 655.

That holding cannot apply here because this Act covers websites by reference to the content they disseminate.

Similarly, *TikTok* rejected a challenge to a law covering an expressly identified website (TikTok) based on "a *foreign adversary's control* over a communications platform." 604 U.S. at 69 (emphasis added). In that unique national-security context about a congressionally designated "foreign adversary['s] control" over a website, the Supreme Court applied "intermediate scrutiny." *Id.* at 73. *TikTok* thus held it did not have to analyze whether a *separate* coverage provision analogous to the Act's here was content-based, because it was not implicated by that case. *Id.* at 67-68.

Defendant also misapprehends why it is important that minors may be able to view similar content in some circumstances on both covered and not covered websites. AG.Br.42. This does not show that the Act's coverage definition is content-neutral. Rather, this demonstrates a *tailoring* problem (underinclusiveness) arising from the law's other content-based distinctions.

Finally, severability cannot solve the Act's First Amendment violations. *Contra* AG.Br.50-51. The *remedy* of severing content-based statutory provisions cannot avoid the logically prior *merits* determination of whether the law triggers and fails strict First Amendment scrutiny. *Barr*, for instance, considered a law that prohibited robocalls to cell phones, but made content-based exceptions for collecting debts owed to the federal government. 591 U.S. at 616. Only after (1) determining the law was content-based, and (2) concluding the law failed strict scrutiny, did the

plurality sever the content-based exception as a remedy. *Id.* at 621. Severability was the final remedial step, not a mechanism to avoid the First Amendment merits analysis. The *Barr* severability analysis was unique because a "generally applicable robocall restriction would be permissible under the First Amendment," unlike other speech restrictions. *Id.* at 633. So the constitutional infirmity in *Barr* was not the robocall ban itself (*i.e.,* the speech restriction), but rather the "[un]equal-treatment" of different kinds of robocalls. *Id.* at 623. Severability eliminated that unequal treatment.

Here, there is nothing this Court could sever that would make the Act's operative speech restrictions valid.

### E. The Act's speech restrictions are facially unconstitutional, and the district court's decision can be affirmed under NetChoice's as-applied challenges.

**1.** The district court correctly ruled that the Act's speech restrictions are facially invalid: Their "unconstitutional applications substantially outweigh [their] constitutional ones" when "judged in relation to the statute's plainly legitimate sweep." *Moody*, 603 U.S. at 723-24 (citation omitted).

**a.** The nature of the First Amendment merits arguments determines what facts are "pertinent" to a facial-challenge analysis. *AFP*, 594 U.S. at 618.

This case largely turns on applying the Supreme Court's *Brown*, *Packingham*, and *FSC* decisions. As explained in *Brown*, governments lack the "power to prevent children from hearing or saying anything *without their parents' prior consent*." 564 U.S. at 795 n.3. *FSC* held that "submitting to age

verification is a burden on the exercise of" the "right to access" speech fully protected for both adults and minors alike. 606 U.S. at 482-83. And *Packingham* made clear that people have a right to "access" "social media" websites free from governmental restraint. 582 U.S. at 108. Those decisions outline relatively few "pertinent" facts: Whether the laws in question restrict access to fully protected speech. *AFP*, 594 U.S. at 618.

Within the framework articulated by *Moody*, the facial-challenge analysis is functional and tailored to the First Amendment merits arguments raised in specific cases. Consequently, not all the facts that *Moody* considered pertinent to the *Moody* plaintiffs' challenges to laws compelling websites to disseminate more user-generated speech are relevant here. Courts cannot treat *Moody*'s discussion of the facial challenge there as a checklist of specific facts that must be explored in *every* First Amendment case. The merits arguments raised here challenging these *restrictions* on accessing social media websites render many of the facts *Moody* considered wholly irrelevant. Nor did *Moody* say that every First Amendment case will require website-specific analyses. *Contra* AG.Br.55.

**b.** *Moody*'s facial-challenge inquiry "first" asks what "actors" and "activities" the Act regulates. *Id.* at 724. This Act targets an identifiable set of "actors" ("social media" websites) and "activities" (access to those websites and their speech dissemination). The Supreme Court has identified these actors and activities as fully protected. *E.g.*, *Packingham*, 582 U.S. at 108. The

"pertinent facts" are therefore "the same across the board." *AFP*, 594 U.S. at 618.

The "actors" and "activities" regulated by the Act single out the very "social media" websites that people have a First Amendment right to "access." *Packingham*, 582 U.S. at 108. Specifically, the Act regulates only "social media" websites as defined by the Act: those that allow users to "create a profile, upload posts, view and listen to posts, form mutual connections, and interact publicly and privately with other[s]." § 36-6-1(6).[8] Or, as *Moody* put it, the Act regulates websites that "allow users to upload content . . . to share with others." 603 U.S. at 719. Because the district court properly identified the "*kinds of* websites" regulated by the Act, *id.* at 718 (emphasis added), it did not need to provide an exhaustive census of every possibly covered website, as Defendant suggests (AG.Br.55).

If there were any doubt, this Act's exceptions obviate any need for a nuanced analysis of different "kinds of websites" identified by *Moody*, which might "fall on different sides of the constitutional line" for laws mandating websites disseminate more user-generated speech against their will. 603 U.S. at 718, 726. This Act excludes "email." § 39-6-1(6)(A); *see Moody*, 603 U.S. at

---

[8] So this Act's coverage definition differs from the Florida law discussed in *Moody*, which had the potential to cover "'any information service, system, Internet search engine, or access software provider' that '[p]rovides or enables computer access by multiple users to a computer server.'" 603 U.S. at 720 n.1.

725. The Act excludes "[o]nline shopping or ecommerce." § 39-6-1(6)(E); *see Moody*, 603 U.S. at 725 ("payment service[s]" and "online marketplace[s]"). And the Act excludes websites where the "content . . . is preselected by the provider and not user generated." § 39-6-1(6)(D); *see Moody*, 603 U.S. at 725 ("ride-sharing service[s]").

To the extent there are questions at the margins of precisely *which* social media websites are regulated by the Act, that is not an impediment to NetChoice's facial challenge. Such questions go to *how much* protected speech the Act restricts, not *whether* the Act restricts protected speech. *Packingham* held it is unnecessary to identify a statute's "precise scope" when it restricts "access" to speech; it "is enough" that the Act restricts access "to social networking sites." 582 U.S. at 106-07.

Nor does this Court need to inquire into covered websites' differing levels of content moderation. *Contra* AG.Br.56-57. *Packingham* held that "restrict[ing]" "access" to online speech triggers First Amendment protection. 582 U.S. at 108. That holding applies equally to social media websites engaging in extensive content moderation and to message boards with relatively little curation. In any event, NetChoice's members engage in the precise curation activities *Moody* held were expressive. *See infra* p.4.[9]

---

[9] For similar reasons, even if some of those communications on covered websites are private, such individual-to-individual communications are fully protected from governmental restriction, too. *E.g., Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126-31 (1989).

On these "social media" websites, the Act's regulated "activities" are plain on the law's face. *Moody*, 603 U.S. at 724. The Act uses content-based coverage criteria to regulate access to the websites through parental-consent and age-verification requirements. And it restricts the kind of advertising those websites can show to minors. So "the Act imposes a platform-wide burden on users' right to engage in [] speech" that does not "differ between the platforms regulated." *Griffin II*, 2025 WL 978607, at *7.

**c.** The facial-challenge analysis "next" compares the Act's unconstitutional applications to any constitutional applications, asking whether the former "substantially outweigh" the latter. *Moody*, 603 U.S. at 723-24. That inquiry here is straightforward "from the face of the law": All aspects of the Act's speech regulations, "in every application to a covered social media company, raise the same First Amendment issues." *X Corp. v. Bonta*, 116 F.4th 888, 899 (9th Cir. 2024).

The Act's "'legitimate sweep' is marginal at best." *HMF*, 137 F.4th at 1239. Covered websites disseminate a "staggering amount" of fully protected speech across "billions of posts." *Moody*, 603 U.S. at 719, 734. And restricting access to these countless posts of fully protected speech "substantially outweigh[s]" any possible constitutional applications to unprotected speech. *Id.* at 724. So it does not matter whether there might be some small amount of unprotected speech on covered websites. *Contra* AG.Br.57. The First Amendment's "less demanding" facial-challenge standard accommodates some applications to unprotected speech. *Moody*,

603 U.S. at 723. Any book or video game could potentially have unprotected expression (*e.g.*, defamation). Allowing the government to restrict *all* the speech in those mediums because there might be an unprotected needle in the haystack would "vitiate the rule that only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials." *Brown*, 564 U.S. at 802 (cleaned up).[10]

Nor does this Court need to weigh the Act's application to minors younger than 13, because covered websites do not allow such minors to create accounts. So any purported applications to such minors are not "actual applications of the statute." *City of L.A. v. Patel*, 576 U.S. 409, 419 (2015). And the parental-consent requirement in *Brown* was facially unconstitutional even though it applied to minors younger than 13, too. 564 U.S. at 789, 802.

Because the Act is presumptively unconstitutional in all applications by restricting protected speech, those presumptively unconstitutional applications "substantially outweigh" any purportedly constitutional applications. *Moody*, 603 U.S. at 723-24. And it becomes "the Government['s]" "burden" to "prov[e] the constitutionality of its actions."

---

[10] To the extent that such unprotected speech and websites are relevant, they are relevant to tailoring. This Act itself provides a less-restrictive alternative, as other unchallenged State laws *already* require age-verification for pornography websites. *See* § 39-5-5.

*Cruz*, 596 U.S. at 305 (citation omitted). Defendant cannot, so the Act is facially unconstitutional.

For instance, "the law's overbroad tailoring does not vary between covered" websites. *CCIA*, 747 F. Supp. 3d at 1031. Defendant wrongly argues that individual websites "requir[e] distinct tailoring analyses." AG.Br.56. That misstates the heightened First Amendment scrutiny analysis. Whether a *statute's entire coverage* is properly tailored depends "on the relation it bears to the *overall problem* the government seeks to correct, not on the extent to which it furthers the government's interest in an individual case." *United States v. Edge Broad. Co.*, 509 U.S. 418, 430 (1993) (emphasis added). Put another way, the court must examine the law's general breadth to determine whether a law is properly tailored. *Id.* Regardless, the *government* bears the burden to demonstrate that a law is properly tailored. *See supra* p.12.

The Act's qualifier for "commercially reasonable" age-verification methods cannot frustrate this facial challenge. *See supra* pp.21-22, 28; *contra* AG.Br.57. Unlike in *Fitch*, Defendant here *has* provided evidence of what he contends could be commercially reasonable for websites. *See* Dkt.23-2. Defendant provided an expert declaration outlining various ways that covered websites can purportedly verify age—which concludes that websites may be able to pay as little as "0.8 cents" per user. Dkt.23-2 at 22. Defendant cannot simultaneously argue that the record lacks evidence of what would be "commercially reasonable" for purposes of the

facial-challenge analysis *and* assert that a variety of methods are "cheap" for purposes of applying First Amendment scrutiny. AG.Br.61.

In any event, States cannot insulate their unconstitutional speech restrictions from facial challenges by purporting to require bespoke restrictions from each regulated actor. *See* Appellee's Br. at 24-27, *NetChoice, L.L.C. v. Fitch*, No. 25-60348 (5th Cir. Oct. 2, 2025), Dkt.40. That just magnifies the unconstitutional vagueness. *See supra* pp.23-25.

**2.** At a minimum, the Act is unconstitutional as-applied to the extent it regulates NetChoice members' covered services. *See supra* p.3 & n.2. Put otherwise, the Act is unconstitutional "to the extent" that it regulates NetChoice's members' services. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (analyzing First Amendment challenge "to the extent of [the] reach" defined by plaintiff).

These services are precisely the kinds of—if not *the*—"social media" websites discussed by the Supreme Court in *Moody* and *Packingham* and explained above. In fact, multiple members' services have been discussed by the Court as examples of such services, including "Facebook," "Twitter" (now X), and "YouTube." *Moody*, 603 U.S. at 740; *Packingham*, 582 U.S. at 99. Likewise, members' websites (including "Facebook" and "YouTube") are the kinds of websites the Court has held "engage[] in expression" by "mak[ing] choices about what third-party speech to display and how to display it." *Moody*, 603 U.S. at 716.

## II. NetChoice is likely to succeed on the merits of its 47 U.S.C. § 230 preemption claim challenging the Act's advertising restrictions.

The Act's restriction on disseminating third-party ads on minors' accounts, § 39-6-3(1), is also preempted by 47 U.S.C. § 230. *See* Dkt.34 at 44-45. It imposes liability on covered websites for publishing third-party-generated ads and requires covered websites to monitor third-party content for such ads.

Under Section 230, no website "shall be treated as the publisher or speaker of any information provided by" someone else. 47 U.S.C. § 230(c)(1).[11] "No cause of action may be brought and no liability may be imposed . . . that is inconsistent with" Section 230. *Id.* § 230(e)(3). Through Section 230, Congress granted websites "broad immunity" for "all claims stemming from their *publication of information created by third parties*." *Salesforce*, 123 F.4th at 794 (cleaned up). This protection precludes States from penalizing websites for exercising "editorial functions" over third-party content, such as "decisions relating to the monitoring, screening, and deletion of content." *Id.* at 797, 798 (citation omitted). Likewise, "acts of arranging and sorting content are integral to the function of publishing." *M.P. by & through Pinckney v. Meta Platforms Inc.*, 127 F.4th 516, 526 (4th Cir. 2025).

---

[11] Covered websites qualify as "interactive computer service[s]" under § 230(f)(2). *E.g.*, *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 744 (9th Cir. 2024).

Here, Section 230 preempts the restriction on ads displayed to minors' accounts. The Act would impermissibly subject covered websites to "cause[s] of action" and "liability," § 230(e)(3), for publishing third-party-generated ads. Courts have concluded that Section 230 protects websites' decisions to disseminate ads. *See, e.g.*, *Calise*, 103 F.4th at 744; *FTC v. Match Grp., Inc.*, 2022 WL 877107, at *10 (N.D. Tex. Mar. 24, 2022).

Moreover, Section 230 preempts requirements "based on [websites'] efforts to screen content." *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 n.3 (11th Cir. 2006); *see Doe v. Grindr Inc.*, 128 F.4th 1148, 1153 (9th Cir. 2025) ("monitor third-party content"); *Salesforce*, 123 F.4th at 793 ("decisions relating to the monitoring" and "screening" of content (citation omitted)). Accordingly, the Act is preempted to the extent it requires websites to monitor for "advertisements" in user-generated content, such as posts touting an author's new book, a band's new tour, or a teen's lawncare services.

Defendant responds that Section 230 only preempts liability for "harm done by third-party content." AG.Br.54 (citation omitted). But Defendant relies on Fifth Circuit precedent for this proposition, and both prior and subsequent Fifth Circuit precedent clarified that Section 230 is not so narrow. Through Section 230, Congress preempted laws overseeing websites' content moderation. *Salesforce*, 123 F.4th 788 at 793, 798; *see Doe v. MySpace, Inc.*, 528 F.3d 413, 419-20 (5th Cir. 2008). The district court therefore properly relied on *Salesforce*'s general articulation of Section 230's scope—not the Fifth

Circuit's application of Section 230 to the inapposite facts of *Salesforce*. *Contra* AG.Br.54-55.

## III. NetChoice has standing.

NetChoice has both Article III associational standing to assert its regulated members' rights and prudential standing to raise the interests of those members' users. *See* Dkt.34 at 7-15.

### A. NetChoice has Article III associational standing to challenge the Act's speech restrictions on behalf of its covered members.

**1.** NetChoice has Article III associational standing to assert the rights of its regulated members. *See* Dkt.34 at 8-13; *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 804-05 (5th Cir. 2025); *Uthmeier*, 2025 WL 1570007, at *6-9; *Reyes*, 748 F. Supp. 3d at 1118-19; *CCIA*, 747 F. Supp. 3d at 1029-31; *Griffin I*, 2023 WL 5660155, at *10.

First, Defendant does not dispute that NetChoice satisfies "the first requirement of associational standing" because NetChoice's regulated "members would have standing to sue in their own right." *S. River Watershed All., Inc. v. Dekalb Cnty.*, 69 F.4th 809, 819 (11th Cir. 2023). The "object" of a regulation has standing to challenge laws that regulate it. *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 114 (2025). Defendant suggests that "there is a question as to each member whether SB 351 applies to it at all." AG.Br.24. Yet, Defendant has never disputed that multiple NetChoice members operate websites regulated by the Act. *E.g.*, Dkt.5-3 at 11-12; Dkt.5-4 at 30-31; Dkt.5-5 at 25; Dkt.5-6 at 7.

As regulated parties, NetChoice's members face two injuries further qualifying as Article III injuries. Members "suffer an irreparable injury because there is an 'ongoing violation of the First Amendment.'" *Honeyfund.com*, 94 F.4th at 1283 (citation omitted). Regulated members also would need to expend unrecoverable funds to comply with the Act. *E.g.*, Dkt.5-3 at 15-17; Dkt.5-4 at 31; Dkt.5-5 at 27, 29, 31; Dkt.5-6 at 19-20; *see Georgia v. President of the United States*, 46 F.4th 1283, 1302 (11th Cir. 2022).

Second, Defendant does not dispute that the "interests at stake are germane to [NetChoice's] purpose," *Watershed*, 69 F.4th at 820 (cleaned up), "of promoting free speech and free enterprise on the Internet," Dkt.5-3 at 1.

Finally, "neither the claim asserted nor the relief requested requires the participation of individual members." *Watershed*, 69 F.4th at 820 (cleaned up). Although the first two prongs of the associational-standing analysis are jurisdictional, this third prong is "prudential." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546, 555 (1996) (citation omitted). Here, "the declaratory and injunctive relief sought by [NetChoice] does not require the individual participation of [NetChoice's] members." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1342 (11th Cir. 2014); *see Greater Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1316 n.29 (11th Cir. 2021).

Assuming that some member participation were necessary, the question is whether either the claim or requested relief "would require *excessive* participation." *Borrero v. United Healthcare of N.Y., Inc.*, 610 F.3d 1296, 1306

(11th Cir. 2010) (emphasis added). Defendant has not pointed to any factual dissimilarities among regulated websites that are "pertinent" to NetChoice's challenges, or that would require excessive member participation. *AFP*, 594 U.S. at 618. Consequently, this case does not require the kinds of extensive "individualized inquiries" that defeat associational standing. *Contra* AG.Br.22-24.

Rather, Defendant points to the kinds of non-pertinent differences among regulated entities that will be true in nearly every case. For instance, Defendant contends that NetChoice's members prioritize different kinds of content, distinguishing "messaging-driven applications like Snapchat and neighborhood-focused platforms like Next[d]oor." AG.Br.23. But the First Amendment and Section 230 analyses do not ask what kinds of fully protected speech websites disseminate. Under Defendant's view, however, the government could require parental consent for minors to play video games and assert that a trade association lacks associational standing because some video games feature football and others feature car racing. That is not the law. *E.g.*, *Brown*, 564 U.S. at 802.

Likewise, Defendant claims that members' differing resources bears on the First Amendment analysis. As explained above (at pp.21-22), whether a company can afford to comply with a speech restriction does not make the speech restriction constitutional.

Because nothing about this case would require excessive participation of NetChoice's members, Defendant's cited cases cannot overcome

NetChoice's associational standing. *Contra* AG.Br.22-24. They all consider claims where the precise and highly individualized factual circumstances of the plaintiffs' members was pertinent to the merits analysis.

For example, *NetChoice, LLC v. Bonta* recognized that NetChoice has associational standing to raise as-applied claims on its members' behalf in certain circumstances—even crediting one of NetChoice's as-applied challenges. 152 F.4th 1002, 1016-17 (9th Cir. 2025). Otherwise, *Bonta*'s contrary holding about NetChoice's as-applied challenges to California's personalized-feeds requirements is distinguishable because this case does not concern a statute directly regulating personalized feeds and where the coverage definition regulates only "personalized feeds." *Id.* at 1010-12. The Georgia Act here imposes broad restrictions on threshold access to regulated websites, targeting all websites that allow users to "upload posts, view and listen to posts . . . and interact publicly and privately with other[s]." § 36-6-1(6). So this Act is not limited to websites with personalized feeds.

And this case is unlike the collection of nearly a thousand "as-applied claims" in *Free Speech Coalition, Inc. v. Attorney General of the United States*, 974 F.3d 408, 420-21 (3d Cir. 2020). *Contra* AG.Br.22-26. That case considered distinguishable restrictions "requir[ing] producers of pornography to verify the age and identity *of each person portrayed*, to keep records of the age verification, and to label each depiction with the location where law enforcement may obtain those records." *Free Speech Coal.*, 974 F.3d at 413. And the as-applied claims in that case were brought on behalf of "about *800*

*members* . . . ranging from directors, producers, writers, cameramen, and lighting technicians, to sellers." *Id.* at 422 (emphasis added; cleaned up). The law at issue there would plausibly affect different groups of members in different ways that were material to precisely whether and how the First Amendment applied. Such a broad set of hundreds of disparate as-applied claims is far different from the facial challenge on which the district court ruled here.

Nor is this case like the "Takings Clause claim" evaluated in *Georgia Cemetery Ass'n, Inc. v. Cox*, 353 F.3d 1319, 1322 (11th Cir. 2003). *Contra* AG.Br.22. A successful takings claim requires showing that there has been (1) a "taking" (2) without payment of "just compensation." U.S. Const. amend. V. Both inquiries can be individualized, especially when "regulatory" takings are at issue, as in *Cemetery Association*. The Supreme Court's "regulatory takings jurisprudence . . . is characterized by essentially *ad hoc, factual inquiries*." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 (2002) (emphasis added) (cleaned up). That is why *Cemetery Association* concluded that "the economic impact of these provisions will vary depending upon the economic circumstances of each of its members." 353 F.3d at 1322.

Finally, NetChoice's challenge here is unlike the free-exercise claim in *Harris v. McRae*, 448 U.S. 297, 321 (1980); *contra* AG.Br.22-23. *Harris* observed that "it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion,"

which "ordinarily requires individual participation." 448 U.S. at 321. The organization in *Harris* could not overcome that unique free-exercise presumption because "the permissibility, advisability and/or necessity of abortion according to circumstance is a matter about which there is diversity of view within . . . [the organization's] membership." *Id.* at 321.

**2.** Because NetChoice has associational standing, it is unnecessary for the Court to additionally conclude that NetChoice can assert its members' *users'* rights as a matter of prudential standing to affirm the judgment. In the First Amendment context, the rights of publishers and their audiences are intertwined. The constitutional "protection afforded is to the *communication, to its source and to its recipients both.*" *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) (emphasis added). When the government restricts *disseminating* "communication" (affecting publishers) it simultaneously restricts *accessing* "communication" (affecting users).

When the State requires websites to obtain age verification or parental consent before a user can access speech, it simultaneously requires age verification or parental consent before websites can disseminate that speech to viewers. For example, *Brown* and *FSC* are often framed in terms of the *audience's* First Amendment rights, even though those claims were brought by trade associations representing publishers. *Brown* explained—in sustaining a challenge to a parental-consent requirement—that "government" generally cannot "bar public dissemination of protected materials to" minors. 564 U.S. at 802 (citation omitted).

**B. NetChoice has prudential standing to raise the First
   Amendment rights of social media website users when
   challenging laws restricting users' access to protected speech.**

Regardless, NetChoice has prudential standing to assert the interests of
its regulated members' *users*. *See* Dkt.34 at 13-14; *see also*
NetChoice.Fla.Br.43-48. Multiple courts have recognized this in substantially
similar challenges. *See Fitch*, 134 F.4th at 805-07; *Yost*, 716 F. Supp. 3d at
550-51; *Uthmeier*, 2025 WL 1570007, at *9; *CCIA*, 747 F. Supp. 3d at 1031;
*Griffin I*, 2023 WL 5660155, at *10-12.

Under the First Amendment, "litigants are permitted to challenge a
statute not because their own rights of free expression are violated, but
because of a judicial prediction or assumption that the statute's very
existence may cause others not before the court to refrain from
constitutionally protected speech or expression." *Virginia v. Am. Booksellers
Ass'n, Inc.*, 484 U.S. 383, 392-93 (1988) (cleaned up). In *American Booksellers*,
for instance, booksellers and their trade associations could challenge a law
restricting the display of particular kinds of books to minors—while
"alleg[ing] an infringement of the First Amendment rights of bookbuyers."
*Id.* at 393; *see id.* at 387-88 & n.3, 393 & n.6. More generally, parties have
"standing to litigate the rights of third parties when enforcement of the
challenged restriction against the litigant would result indirectly in the
violation of third parties' rights." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004).

And in the First Amendment context, this prudential-standing analysis is "quite forgiving." *Id.*

The Fifth Circuit held that NetChoice has prudential standing to raise its members' users' rights because "it is plain that an online platform is not barred by prudential standing when it asserts its users' First Amendment rights, at least *when the violation of those rights adversely affects the platform*." *Fitch*, 134 F.4th at 807 (emphasis added). And the Western District of Arkansas ruled that "NetChoice—like the booksellers' association in the *Virginia* case—is in a unique position to advocate for the rights of Arkansas users and may appropriately do so[.]" *Griffin I*, 2023 WL 5660155, at *12. Those decisions implicitly recognize that the fact that NetChoice (and not its members) have brought this case does not require this court to adopt "fourth-party standing." *Contra* AG.Br.29, 31. NetChoice "assert[s] the claims of its members" and thus stands in members' shoes. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977).

Because members and their users have a shared interest in accessing and disseminating protected speech, Defendant's contrary arguments are unpersuasive. For instance, multiple courts have recognized that this shared interest in the speech satisfies whatever necessary "close"-relationship test applies in the First Amendment context. *E.g., Yost*, 716 F. Supp. 3d at 550-51; *Uthmeier*, 2025 WL 1570007, at *9; *contra* AG.Br.26-27.

Similarly, no misalignment exists between regulated websites and their users seeking to disseminate and access fully protected speech in this First

Amendment challenge. *Contra* AG.Br.27-28. This argument, too, has been rejected by many courts. *Fitch*, 134 F.4th at 806-07; *Yost*, 716 F. Supp. 3d at 550-51; *Griffin I*, 2023 WL 5660155, at *12.

Defendant's argument about misaligned interests mischaracterizes—or, at least presumes the merits about—the Act's speech restrictions as a "consumer protection law." AG.Br.27-28. This Act restricts accessing and disseminating speech. Allowing Defendant to recharacterize such restrictions as mere consumer protection laws would impede standing in every First Amendment case where the government deems protected speech harmful. Yet the Supreme Court has consistently allowed publishers to challenge such restrictions. *E.g.*, *Am. Booksellers*, 484 U.S. at 392-93 (law regulating "explicit" materials to minors). In all those cases, the affected third parties could have plausibly sued on their own. So the mere fact that users could *also* sue cannot defeat standing here. *Contra* AG.Br.28-29; *see* NetChoice.Fla.Br.46.

## IV. The district court's preliminary injunction has prevented irreparable harm and is supported by the balance of the equities and the public interest.

NetChoice's "likelihood of success on the merits" means "the remaining requirements" for preliminary-injunctive relief "necessarily follow." *Honeyfund.com*, 94 F.4th at 1283. The district court correctly applied that precedent and granted NetChoice a preliminary injunction. Dkt.34 at 45-50.

**A.** As explained above at p.47, NetChoice's regulated members face twin irreparable harms. They "suffer an irreparable injury because there is an ongoing violation of the First Amendment. Such a violation, even for a minimal period of time, constitutes irreparable injury." *Honeyfund.com*, 94 F.4th at 1283 (cleaned up). In addition, the Act also requires websites to adopt age-verification and parental-consent systems and alter their ad publication. For some members, compliance is "far in excess of [the] available budget," if not "impossible." Dkt.5-6 at 13, 20. These unrecoverable compliance costs are likewise irreparable harm. *Georgia v. President*, 46 F.4th at 1302.

Yet Defendant asserts that NetChoice has failed to demonstrate irreparable harm. He incorrectly claims "NetChoice waited until the eve of SB 351's effective date" to sue. AG.Br.59. The district court rightly rejected this argument. Dkt.34 at 46-47. As NetChoice explained, it waited until after the 2025 legislative session to sue. Dkt.34 at 47. And NetChoice sued approximately two months before the Act took effect. Defendant's cited cases do not hold otherwise. AG.Br.59-60. For instance, *Wreal* considered a situation when a party waited for "months" *after suing* to move for preliminary-injunctive relief. *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). Here, by contrast, NetChoice sued and moved for relief on the same day. *See* Dkt.1, 5.

Nor does the Act's 90-day notice period undercut the irreparable harm that the law would impose on covered members. The district court correctly

concluded that this notice period "does not actually assist social media platforms, which will incur substantial costs *before* the Act goes into effect to bring their practices into compliance—nor does it mitigate the speech-chilling effect that the threat of enforcement will necessarily impose." Dkt.34 at 47-48.

**B.** The balance of equities and public interest also favor NetChoice. *Contra* AG.Br.60-61.

Defendant's lead argument invokes *Fitch*'s one-sentence order denying NetChoice relief on the Supreme Court's emergency docket. AG.Br.59. But circumstances have changed since Justice Kavanaugh's single-Justice concurrence stated that the "equities . . . *at this time*" did not warrant vacating a stay of a preliminary injunction. 145 S. Ct. at 2658 (emphasis added). At that point in that Mississippi case, no covered websites had stopped serving minors in Mississippi. But since that law took effect without an injunction, multiple websites have stopped disseminating speech to their users. Dreamwidth was "forced to block access to Dreamwidth from all IP addresses that geolocate to Mississippi." Dreamwidth, *Mississippi legal challenge: beginning 1 September, we will need to geoblock Mississippi IPs* (Aug. 26, 2025), https://perma.cc/G3E4-262C. On Nextdoor, minors "are not permitted to create an account . . . if they are residents of . . . . Mississippi." Nextdoor, *Member Agreement* (Aug. 15, 2025), https://perma.cc/NL3M-78PJ. The same happened in Tennessee. Dkt.5-1 at 35.

*Fitch*'s one-sentence order does not override this Court's holding that likelihood of success on First Amendment claims means the other preliminary-injunction factors are satisfied. *See Honeyfund.com*, 94 F.4th at 1283. And the changed circumstances—websites blocking users' access—means this is not a "like case" to the posture *Fitch* was in months ago. *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025).

On NetChoice's side, websites and users would suffer the loss of First Amendment freedoms and face unrecoverable compliance costs that exceed members' "available budget." Dkt.5-6 at 20. On Georgia's side, however, "government has 'no legitimate interest' in enforcing an unconstitutional law." *Honeyfund.com*, 94 F.4th at 1283 (citation omitted).

At bottom, "it is in the public interest to protect First Amendment rights." *Id.* The Act threatens to balkanize the internet, where Georgia citizens have less access to protected speech than their neighbors. Preserving access to these "principal sources for knowing current events … and otherwise exploring the vast realms of human thought and knowledge" serves the public interest. *Packingham*, 582 U.S. at 107.

## CONCLUSION

This Court should affirm.

Dated: November 24, 2025

Respectfully submitted,

/s/ Scott A. Keller

Joshua P. Morrow
LEHOTSKY KELLER COHN LLP
7500 Rialto Blvd. Suite 1-250
Austin, TX 78735
(512) 693-8350

Jared B. Magnuson
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305

Scott A. Keller
  *Counsel of Record*
Steven P. Lehotsky
Serena M. Orloff
Jeremy Evan Maltz
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW
Suite 700
Washington, DC 20001
scott@lkcfirm.com

*Counsel for NetChoice*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,965 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Palatino Linotype type.

*/s/ Scott A. Keller*
Scott A. Keller

## CERTIFICATE OF SERVICE

I certify that on November 24, 2025, I electronically filed the foregoing

with the Clerk of the Court for the United States Court of Appeals for the

Eleventh Circuit by using the CM/ECF system. I certify that all participants

in this case are registered CM/ECF users and that service will be

accomplished by the CM/ECF system.

*/s/ Scott A. Keller*
Scott A. Keller