**FOR PUBLICATION**

In the

# United States Court of Appeals

For the Eleventh Circuit

---

No. 25-12436

---

NETCHOICE,

*Plaintiff-Appellee,*

*versus*

ATTORNEY GENERAL, STATE OF GEORGIA,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:25-cv-02422-AT

---

Before NEWSOM, LUCK, and TJOFLAT, Circuit Judges.

NEWSOM, Circuit Judge:

The State of Georgia recently enacted SB 351 to restrict minors' ability to create accounts on social-media platforms. The law requires platforms within its ambit to verify the ages of all their

users, to prohibit minors under the age of 16 from creating accounts without their parents' consent, and to limit the personal data they use to display ads to users under 16.

NetChoice, an Internet trade organization, sued the state, alleging that SB 351 violates the First Amendment both on its face and as applied to its members, is unconstitutionally vague, and is preempted by § 230 of the Communications Decency Act. Finding that it lacked sufficient facts to evaluate an as-applied challenge, the district court decided NetChoice's facial First Amendment, vagueness, and preemption challenges. The court concluded that SB 351 likely violated the First Amendment on its face, was unconstitutionally vague, and was preempted by § 230, and accordingly enjoined the state from enforcing it. Before us, the state contends (1) that NetChoice lacks standing to challenge SB 351; (2) that NetChoice has failed to make out a facial First Amendment challenge; (3) that all challenged provisions of SB 351 are likely constitutional and not preempted; and (4) that NetChoice has failed to meet the remaining requirements for obtaining a preliminary injunction.

We hold as follows: NetChoice has associational standing to challenge SB 351's validity on behalf of its members. However, NetChoice has failed to carry the burden it bears in connection with its facial First Amendment challenge under *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). Nor has it shown a likelihood of success on the merits with respect to its vagueness or § 230 challenges. Because we hold that NetChoice's facial First Amendment

challenge fails on *Moody* grounds, we needn't address the merits of its First Amendment claim or the remaining preliminary-injunction factors.

# I

## A

SB 351 regulates social-media platforms. In particular, the law requires covered platforms (1) to "make commercially reasonable efforts to verify the age[s] of account holders"; (2) to prohibit minors under 16 years of age from holding accounts without their parents' consent; and (3) to bar the display of ads to accountholders under 16 based on any personal information other than their ages and locations. Ga. Code Ann. §§ 39-6-2(a), (c), 39-6-3(1) (2026).

SB 351 defines "social media platform" in general terms: "an online forum that allows an account holder to create a profile, upload posts, view and listen to posts, form mutual connections, and interact publicly and privately with other account holders and users." *Id.* § 39-6-1(6).

That definition, though, is subject to a raft of enumerated exceptions, which we mention here because NetChoice contends that some of them discriminate on the basis of expressive content and thus presumptively violate the First Amendment. As defined by SB 351, a "social media platform" does not include any "online service, website, or application where the predominant or exclusive function is" any of the following: "[e]mail"; "[a] streaming service"; "[n]ews, sports, entertainment, or other content that is pre-

selected by the provider and not user generated"; "[o]nline shopping or ecommerce"; "[i]nteractive gaming [or] virtual gaming"; "[p]hotograph editing"; "[s]ingle-purpose community groups for public safety"; "[b]usiness-to-business software"; "[t]eleconferencing or videoconferencing services"; "[c]loud storage"; "[s]hared document collaboration"; "[c]loud computing services"; "[p]roviding access to or interacting with data visualization platforms, libraries, or hubs"; "[p]ermitting comments on a digital news website"; "[p]roviding or obtaining technical support"; "[a]cademic, scholarly, or genealogical research"; "[i]nternet access and broadband service"; "[a] classified advertising service . . . [p]ermitting only the sale of goods" and "[p]rohibiting the solicitation of personal services"; "[a]n online service, website, or application that is used by or under the direction of an educational entity, including a learning management system, student engagement program, or subject- or skill-specific program"; "[p]eer-to-peer payments"; or "[c]areer development opportunities." *Id.* §§ 39-6-1(6)(A), (C)–(V). Also excluded from the definition of "social media platform" is any "service that . . . does not permit minors to use the platform and utilizes commercially reasonable age assurance mechanisms to deter minors from becoming account holders." *Id.* § 39-6-1(6)(B).

**B**

On May 1, 2025, two months before SB 351 was slated to take effect, NetChoice brought facial and as-applied First Amendment challenges to the law's pertinent provisions. It also claimed that SB 351 was unconstitutionally vague and that the law was preempted by § 230 of the Communications Decency Act. On the

same day, NetChoice sought a preliminary injunction to prevent SB 351's enforcement.

Following a hearing, the district court granted NetChoice's preliminary-injunction motion. As relevant here, the court issued four key rulings. First, it held that NetChoice had "associational" standing to sue on its members' behalf. Second, the court concluded that NetChoice had third-party standing to assert the rights of its members' *users*. Third, the court determined that it lacked the necessary "factual record" to adjudicate an as-applied First Amendment claim and, accordingly, that it would consider only NetChoice's facial First Amendment challenge.[1] Dist. Ct. Order at 17, June 26, 2025, Dkt. No. 34 ("An as-applied challenge necessarily requires the development of a factual record for the court to consider, which does not exist in the pre-enforcement context. The

[1] The district court's refusal to address NetChoice's as-applied challenge differentiates this case from *CCIA v. Uthmeier*, No. 25-11881, which was orally argued before us on the same day. In *CCIA*, two Internet trade organizations—one of which is NetChoice—sued to enjoin the enforcement of a Florida law that restricts minors' creation of social-media accounts. *See CCIA v. Uthmeier*, 826 F. Supp. 3d 1358, 1364–66 (N.D. Fla. 2025). There, though, the district court preliminarily enjoined the law both on its face and as applied to the plaintiffs' members, enabling us to consider both challenges. *Id.* at 1383 ("Florida's law cannot meet [intermediate scrutiny], either facially or as applied."); *see also CCIA v. Uthmeier*, No. 25-11881, 2025 WL 3458571, at *1 (11th Cir. Nov. 25, 2025) ("[T]he district court granted [CCIA's] request for a broad preliminary injunction preventing the State from enforcing its laws against parties *and non-parties alike*." (emphasis added)). Because the district court here preliminarily enjoined SB 351 only on its face, we consider only NetChoice's facial challenge.

[c]ourt thus focuses on Plaintiff's facial challenge to the Act." (citation modified)). And fourth, the court held that NetChoice was likely to succeed on the merits of its three claims. In particular, it concluded that SB 351 was likely (1) a content-based speech restriction that failed strict scrutiny, (2) unconstitutionally vague, and (3) preempted by § 230. Finding that NetChoice had also met the remaining requirements for obtaining a preliminary injunction, the court enjoined the state from enforcing the challenged provisions of SB 351.

Our analysis proceeds in two parts. First, we address the state's challenge to NetChoice's assertion of associational standing to sue on behalf of its members.[2] Second, we evaluate whether

---

[2] As just noted, the district court also concluded that NetChoice had third-party standing to vindicate the rights of its members' *users*, *see supra* at 5, and NetChoice continues to press that position on appeal, *see, e.g.*, Br. of Appellee at 52–54 (arguing that "NetChoice has prudential standing to raise the First Amendment rights of social media website users"); *accord, e.g.*, Compl. ¶ 87 ("There can be no dispute that . . . the Act imposes a platform-wide burden on users' right to engage in [protected] speech." (citation modified)). But as NetChoice itself concedes, *see* Br. of Appellee at 51, if it has associational standing to maintain its own First Amendment challenge, we needn't address the separate question whether it has third-party standing to pursue claims on behalf of its members' users. Because, for reasons we will explain, we conclude that NetChoice *does* have associational standing, we decline to address the third-party-standing question. *Cf. PDK Lab'ys Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment) (recognizing "the cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more").

NetChoice has shown that it has a likelihood of success on the merits of its various claims.

**II**

"Article III standing is a 'bedrock constitutional requirement.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024) (quoting *United States v. Texas*, 599 U.S. 670, 675 (2023)). To establish standing, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Id.* at 380.[3]

NetChoice asserts standing to vindicate the First Amendment rights of its members—*i.e.*, the social-media platforms. The Supreme Court has recognized that "an organization may sue to redress its members' injuries" under what is known as "associational standing." *United Food & Com. Workers Union Loc. 751 v. Brown Grp.*, 517 U.S. 544, 552 (1996). It's a "form of third-party standing" that arguably "relax[es] both the injury and redressability requirements for Article III standing." *All. for Hippocratic Med.*, 602 U.S. at 398–99 (Thomas, J., concurring).

Under associational-standing principles, an organization may sue on its members' behalf when (1) "its members would otherwise have standing to sue in their own right," (2) "the interests it

[3] "We review the legal question of standing *de novo*." *Charles H. Wesley Educ. Found. v. Cox*, 408 F.3d 1349, 1351 (11th Cir. 2005).

seeks to protect are germane to the organization's purpose," and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Brown Grp.*, 517 U.S. at 553 (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

Only the third, individual-participation requirement is at issue in this case. The Supreme Court has called it a "judicially self-imposed" limit that aims to serve "administrative convenience and efficiency." *Id.* at 555–57. Unlike the first two prongs, which are "constitutional necessit[ies]," this third prong is "prudential." *Id.* at 555–56. Meeting it rebuts the "background presumption" that a litigant (here, NetChoice) may not assert the rights of absent third parties (here, its member platforms). *Id.* at 557.

In similar circumstances, a number of other courts have held that NetChoice satisfies the associational standing test's individual-participation prong. *See NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 805 (5th Cir. 2025) ("NetChoice's 'claims can be proven by evidence from representative injured members' and 'the participation of [certain] individual members does not thwart associational standing.'" (quoting *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 552 (5th Cir. 2010))); *CCIA v. Paxton*, 747 F. Supp. 3d 1011, 1030 (W.D. Tex. 2024), *aff'd in relevant part,* 184 F.4th 420, 445 (5th Cir. 2026); *NetChoice, LLC v. Murrill*, 812 F. Supp. 3d 594, 629–31 (M.D. La. 2025); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1118–19 (D. Utah 2024); *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *10 (W.D. Ark. Aug. 31, 2023). We agree with them.

The state argues that NetChoice lacks associational standing because, on the merits, its First Amendment claim "requir[es] a fact-intensive individual inquiry." Br. of Appellant at 22. For support, it cites *Harris v. McRae*, 448 U.S. 297, 321 (1980), and *Georgia Cemetery Ass'n v. Cox*, 353 F.3d 1319, 1322 (11th Cir. 2003). But both cases are distinguishable. In *Harris*, a pro-choice division of a religious organization asserted that federal abortion-funding restrictions violated the First Amendment's Free Exercise Clause. 448 U.S. at 321. The Supreme Court held that the group couldn't proceed under an associational-standing theory because adjudicating the free-exercise issues would necessarily entail an inquiry into whether and to what extent the restrictions operated coercively on particular members. *Id.* In *Georgia Cemetery*, a cemetery association brought a Takings Clause challenge to a law capping fees for the transfer of burial rights. 353 F.3d at 1322. We held that the group couldn't assert associational standing because resolving its takings claim required the participation of its members. "[T]he economic impact," we reasoned, "will vary depending upon the economic circumstances of" particular cemeteries. *Id.* Generally, whether a violation occurred in the regulatory-takings context requires an individualized inquiry into whether each affected party was denied the compensation it was due. *Tahoe-Sierra Pres. Council v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 (2002) (characterizing regulatory-takings jurisprudence as entailing "'essentially ad hoc, factual inquiries,' designed to allow 'careful examination and weighing of all the relevant circumstances'" (citation modified)).

This case is different. While free-exercise and takings claims require consideration of the laws' effects on *individual* parties, NetChoice's free-speech claim, which it brings on behalf of its member platforms, turns on whether SB 351 implicates the First Amendment, whether it is content neutral or content based, and whether it is appropriately tailored to the asserted state interest—inquiries that don't depend on fact-intensive determinations regarding the member platforms. Nor does NetChoice's requested remedy require the individual members' participation—for the simple reason that it seeks declaratory and injunctive relief, rather than damages. *See Brown Grp.*, 517 U.S. at 553–54 ("If in a proper case the association seeks a declaration, injunction or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." (citation modified)).

The state argues that, even in the free-speech context, NetChoice's claim can't be resolved without the participation of its member platforms. That, the state says, is so for two reasons: (1) NetChoice has a "diverse" membership, and (2) some of NetChoice's members allegedly host pornographic content, meaning that different levels of First Amendment scrutiny may apply to different platforms. At least for purposes of resolving the threshold associational-standing issue, we are satisfied that NetChoice's members' participation isn't required.

First, the state argues that NetChoice's members differ from one another in terms of their content (some are "messaging-driven

applications like Snapchat," others are "neighborhood-focused platforms like Nextdoor"), their size (some are "massive corporations" like Meta, others are "small, niche platform[s]" like Dreamwidth), and their ability to verify age and obtain parental consent (some have the technology, others don't). Br. of Appellant at 23–24. The state insists that these variations trigger different First Amendment analyses for different members.

For support, Georgia relies on *Free Speech Coalition, Inc. v. Attorney General United States*, 974 F.3d 408 (3d Cir. 2020), to show that a trade association's diverse membership can necessitate individual members' participation and thereby foreclose associational standing. We think that case is distinguishable. In that case, two trade groups, among other plaintiffs, challenged on First Amendment grounds federal laws requiring "producers of pornography to verify the age and identity of each person portrayed, to keep records of the age verification, and to label each depiction with the location where law enforcement may obtain those records." *Id.* at 413. One of the associations, Free Speech Coalition, "represent[ed] more than 1,000 member businesses and individuals involved in the production and distribution of adult materials," *id.* at 416 n.3, which—importantly—"rang[ed] from directors, producers, writers, cameramen, and lighting technicians, to sellers," *id.* at 422. The other group represented "some 400" photographers across a "broad range of genres." *Id.* (citation modified). The Third Circuit held that those two plaintiffs couldn't establish associational standing because the "diversity of circumstances" that they represented

meant that the challenged laws imposed different burdens on different group members. *Id.* at 422.

NetChoice's covered members are more homogeneous than in the Third Circuit's *Free Speech Coalition* case; all of them are social-media platforms. Whereas the law at issue in that case may well have affected, say, a director in a different way than a lighting tech, SB 351 imposes the same burden on all covered platforms by requiring them to institute age-verification measures and to obtain parental consent for minors—regardless of any particular platform's content, size, or technological ability.

Second, and separately, the state argues that NetChoice can't satisfy the associational-standing test's individualized-participation prong because "there is a question as to each member whether SB 351 applies to it at all." Br. of Appellant at 24. More specifically, the state asserts that "[c]ertain NetChoice members, such as Reddit and X, allow pornography . . . rais[ing] distinct questions about SB 351's application to those members." Reply Br. of Appellant at 4. What the state seems to mean is that SB 351's application to pornographic content on a platform would be subject to a different constitutional analysis than its application to fully protected speech, even on the same platform. That is so because, as the Supreme Court recently clarified, pornography enjoys no First Amendment protection at all with respect to minors, and, accordingly, a law that requires proof of age to access such speech is subject to intermediate, rather than strict, constitutional scrutiny because its burden on adults is incidental. *Free Speech Coal. v. Paxton*,

606 U.S. 461, 477–83 (2025) (holding that a Texas law requiring pornographic websites to verify users' ages was subject only to intermediate scrutiny). Therefore, the state's argument goes, a court would apply intermediate scrutiny to SB 351's application to any pornographic content on X, but strict scrutiny to its application to political or religious speech on the same platform. Those sorts of distinctions, the state insists, necessitate a platform-by-platform analysis and, therefore, the individual members' participation.

The state is on to something—as our ensuing *Moody* analysis reflects. *See infra* at 15–17 & n.4. But at least at the threshold standing stage, we think the state is making too much of too little. NetChoice's members "host a staggering amount of content," not remotely all of which, happily, is pornographic. *Moody*, 603 U.S. at 719. Because standing is a gateway issue, and because the associational-standing test's individual-participation prong is a prophylactic, "judicially self-imposed" limit, we are willing to assume for present purposes that the content hosted by social-media platforms comprises mostly protected speech. *Brown Grp.*, 517 U.S. at 555–57. Doing so makes sense given the rule that when we assess standing, we "assume that on the merits the plaintiff[] would be successful in [its] claims." *Romano v. John Hancock Life Ins. Co.*, 120 F.4th 729, 737 (11th Cir. 2024) (citation modified). Accordingly, at least for the purposes of evaluating standing, the alleged presence of a marginal amount of unprotected speech on some of the platforms doesn't undermine NetChoice's ability as an association to represent the interests of its members.

We thus hold that NetChoice has associational standing to pursue a First Amendment challenge on behalf of its members.

**III**

Having concluded that NetChoice has associational standing, we now consider whether it has shown a likelihood of success on the merits of its claims. NetChoice challenges SB 351 on three grounds: that it (a) violates the First Amendment, (b) is unconstitutionally vague, and (c) is preempted by § 230 of the Communications Decency Act. We consider them in turn.

**A**

First up, the First Amendment—and, more particularly, the rules that the Supreme Court recently reiterated regarding facial First Amendment challenges. Spoiler alert: This is where most of the action is.

As the Supreme Court warned in *Moody*, the decision to mount a facial challenge "comes at a cost." 603 U.S. at 723. Because "facial challenges threaten to short circuit the democratic process," they are, by design, "hard to win." *Id.* (citation modified); *see also id.* at 745 (Barrett, J., concurring) ("[D]ealing with a broad swath of varied platforms and functions in a facial challenge strikes me as a daunting, if not impossible, task."); *id.* at 748 (Jackson, J., concurring in part and concurring in the judgment) ("[P]laintiffs bringing a facial challenge must clear a high bar."); *id.* at 778 (Alito, J., concurring in the judgment) ("[P]arties mounting facial attacks [must] satisfy demanding requirements."). Even in First Amend-

ment cases, where the facial-challenge bar is lower than it otherwise might be, the plaintiff must show that "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* at 723 (majority opinion) (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)).

To conduct the required *Moody* analysis, a reviewing court proceeds in two steps. First, it must "assess the state laws' scope," asking, "What activities, by what actors, do the laws prohibit or otherwise regulate?" *Id.* at 724. Having done that, the court must then "decide which of the laws' applications violate the First Amendment, and . . . measure them against the rest." *Id.* at 725. To succeed on a facial challenge, a plaintiff must show that "the law's unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 724.

NetChoice contends that it has satisfied the first step by identifying the "*kinds* of websites" regulated by SB 351—social-media platforms. Br. of Appellee at 38 (emphasis in original). In its view, the Supreme Court has already held that social-media platforms engage in protected First Amendment activity, citing *Packingham v. North Carolina*, 582 U.S. 98 (2017). *Id.* at 37. The Court there, NetChoice says, deemed the "identifiable set of 'actors' ('social media' websites) and 'activities' (access to those websites and their speech dissemination)" as "fully protected." *Id.* Thus, NetChoice continues, it's not necessary for facial-challenge purposes that it provide an "exhaustive census of every possibly covered website"

because the first *Moody* step goes to "*how much* protected speech [SB 351] restricts." *Id.* at 38–39 (emphasis in original). Quoting *Packingham*, NetChoice contends that "it 'is enough' that the Act restricts access 'to social networking sites.'" *Id.* (citing *Packingham*, 582 U.S. at 106–07).

We think NetChoice is overreading *Packingham*. The Court there didn't hold that the sheer fact that a law restricts access to "social networking sites" was "enough" to establish that law's scope for facial-challenge purposes. Rather, the Court *assumed* that the law at issue applied to "social networking sites," and determined based on that assumption that the law at issue wasn't narrowly tailored. *Packingham*, 582 U.S. at 106–08. Put simply, *Packingham* was about the merits of the plaintiff's First Amendment claim, not whether that plaintiff had satisfied its burden of making out a facial challenge.

And in fact, it's not necessarily true that social-media websites engage exclusively in "fully protected" speech. The state contends (and no one seems to dispute) that some platforms, like X and Reddit, do host at least some pornography—which is protected for adults but, importantly, not for minors. *See Free Speech Coal.*, 606 U.S. at 485. We agree with the state that SB 351's application (if any) to sites like X and Reddit raises different First Amendment questions than its application to others. *See* Br. of Appellant at 57. As we conceptualize things, the universe of SB 351's applications is actually properly divided into three categories: (1) what we'll call

"conventional" platforms that host fully protected speech; (2) "hybrid" platforms that for the most part host protected speech but also allow some potentially unprotected pornography, like X and Reddit; and (3) "rogue" platforms that host exclusively unprotected speech—think the hypothetical "Incitement.com" or "True-Threats.com." *See* Oral Arg. 12:15–12:49. Because NetChoice hasn't accounted for both the protected and unprotected speech on various platforms—or else adequately shown that SB 351 applies only to platforms that only host protected speech—it hasn't established (or properly grappled with) the full scope of actors and activities regulated by SB 351.[4]

NetChoice also argues that it has satisfied *Moody*'s second step—showing that SB 351's unconstitutional applications far outweigh its constitutional ones—because, it says, "[a]ll aspects of [SB 351's] speech regulations, in every application to a covered social media company, raise the same First Amendment issues." Br. of Appellee at 40 (citation modified). And even if not in *every* application, then at the very least, NetChoice insists, SB 351's "'legitimate sweep' is marginal at best." *Id.* Therefore, the argument goes, restricting access to "countless posts of fully protected

[4] The careful reader will note that our analysis here—in terms of requiring proof of the full range of SB 351's applications—is more rigorous than it was when we were gauging NetChoice's associational standing to sue. *See supra* at 13. Because standing is a threshold inquiry with a prudential element, and because a standing analysis necessarily assumes that the plaintiff will succeed on the merits of its claim, we were willing to make common-sense assumptions there that we don't think we can make here.

speech" "'substantially outweigh[s]' any possible constitutional applications to unprotected speech." *Id.*

But it's not that simple. Even if *most* expression on *most* social-media platforms is protected by the First Amendment, not all of it is, at least not with respect to all users. Depending on the type of speech each platform hosts, a different level of scrutiny may well apply, leading to different determinations about the constitutionality of SB 351's applications.

Recall our discussion of the three categories. A content-based law restricting children's access to fully protected speech—on "conventional" platforms—would trigger strict scrutiny. The same law restricting children's access to pornographic material, which is unprotected for minors, *see Free Speech Coal.*, 606 U.S. at 478, 483, would trigger intermediate scrutiny—which, at least in theory, could apply to "hybrid" platforms like X or Reddit. And the same law restricting children's (or anyone's) access to completely unprotected speech—on "rogue" platforms like "Incitement.com" or "TrueThreats.com"—wouldn't implicate the First Amendment at all and would trigger only rational-basis review. Accordingly, even if SB 351 "imposes the same restriction" on every platform, that restriction could well be subject to different levels of scrutiny, potentially leading to different outcomes.

NetChoice insists that the *state* hasn't shown that the First Amendment doesn't apply in all of SB 351's applications. *See* Oral Arg. 16:25–16:40 ("The state has never suggested some website where there's literally no protected speech, and that's what you

would need to have this law not implicate it."). But in a facial-challenge posture, we don't think it's the state's obligation to do so. Rather, the Supreme Court seems to have put the "burden" squarely on the plaintiff: As the "price" of its "decision to challenge the law[] as a whole," the challenger must "carry its burden" of demonstrating that the invalid applications substantially outweigh the valid ones. *Moody*, 603 U.S. at 744. We acknowledge the distinct possibility that SB 351 overwhelmingly applies to platforms that overwhelmingly host protected speech. And if SB 351's application to those websites *would* be unconstitutional, then the law's unconstitutional applications would probably substantially outweigh the constitutional ones. But however intuitive, that sort of impressionistic judgment won't satisfy *Moody*'s stringent demands. Whether or not it is likely that the collective content of the platforms within SB 351's ambit is overwhelmingly protected, NetChoice bears the "burden" of demonstrating both (1) the universe of the law's applications and (2) that the invalid applications substantially outweigh the valid ones. *See id.*

NetChoice insists that it's the "[g]overnment's burden to prove the constitutionality of its actions" as part of the First Amendment tailoring analysis. Br. of Appellee at 41–42 (citation modified). In particular, NetChoice contends that SB 351's coverage of platforms with varying amounts of protected and unprotected speech simply illustrates that the state needs to more precisely "tailor [its] law to the rogue services." Oral Arg. 13:33–13:40; *see also* Br. of Appellee at 41 n.10 ("To the extent that such unpro-

tected speech and websites are relevant, they are relevant to tailoring."). Again, that's not quite right. NetChoice is conflating the facial-challenge analysis with the merits of its claims. Though the inquiries necessarily overlap, they are separate questions. A plaintiff might be able to meet its facial-challenge burden and yet fail to prove its claim on the merits. Or a plaintiff might have an otherwise meritorious claim and yet fail to carry its *Moody*-imposed "burden" on a facial challenge. *Cf. Gonzales v. Carhart*, 550 U.S. 124, 167 (2007) (rejecting a "facial attack" against a federal statute in favor of an as-applied challenge); *L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 40–41 (1999) (holding that a facial challenge to a state statute must fail and remanding for consideration of an as-applied claim).

To discharge its facial-challenge burden, NetChoice must provide the reviewing court with the data—either hard facts or, at the very least, sufficient briefing—necessary to conduct the *Moody*-required comparative analysis. It hasn't done so here. Indeed, NetChoice hasn't provided even a full list of its own members to which SB 351 applies. Instead, it has provided only an exemplary few: SB 351, NetChoice says, "regulates some websites operated by NetChoice members, including: (1) Dreamwidth; (2) Meta (Facebook and Instagram); (3) Nextdoor; (4) Pinterest; (5) Reddit; (6) Snap Inc. (Snapchat); (7) X; and (8) YouTube," as well as "new members . . . such as Tumblr." Br. of Appellee at 3 & n.2. And though NetChoice contends that, in addition to its own members, SB 351 regulates "other covered 'social media' websites," [***id.* at 3**] it doesn't name any that (in whole or in part) host unprotected

speech. In that respect, we think, NetChoice makes the same mistake that it made before in *Moody*: treating the law as having "certain heartland applications" and "mostly confin[ing its] battle to that terrain." 603 U.S. at 724; *cf. NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1020 (9th Cir. 2025) ("[F]acial challengers cannot focus on a law's effect on their own platforms—they cannot even limit the inquiry to the tech giants."); *NetChoice, LLC v. Yost*, 180 F.4th 268, 312 (6th Cir. 2026) (Batchelder, J., concurring in the judgment) (refraining from addressing NetChoice's facial challenge "without a developed record").

We've learned the facial-challenge lesson the hard way. In *Moody*, the Supreme Court, even while largely agreeing with our merits analysis, faulted us for "mostly confin[ing] [our] analysis" to "certain heartland applications" instead of "address[ing] the full range of activities the law[] cover[ed]." 603 U.S. at 724; *see NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196 (11th Cir. 2022), *vacated and remanded sub nom. Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). The Court went on to observe that even if it were to attempt the facial analysis itself, it couldn't "undertake the needed inquiries" because the "parties ha[d] not briefed the critical issues [t]here, and the record [wa]s underdeveloped." 603 U.S. at 726. The Court therefore vacated and remanded our case (and its companion, *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439 (5th Cir. 2022), *vacated and remanded*, 603 U.S. 707 (2024)), "to consider the scope of the laws' applications, and weigh the unconstitutional as against the constitutional ones." *Id.* at 726. In turn, both we and our colleagues on the Fifth Circuit remanded our respective cases to the

district courts for further development of the issues pertinent to the facial-challenge analysis. *See NetChoice, LLC v. Att'y Gen., State of Fla.*, Order, *NetChoice, LLC v. Att'y Gen., State of Fla.*, No. 21-12355, (11th Cir. Aug. 16, 2024), Dkt. No. 178; *NetChoice, L.L.C. v. Paxton*, 121 F.4th 494, 500 (5th Cir. 2024) (remanding to the district court to "develop a factual record" in response to *Moody*).

We are similarly stymied here. For the foregoing reasons, we conclude that NetChoice has failed to satisfy *Moody* because it hasn't adequately addressed the "full range" of SB 351's applications, and the record before us does not permit the weighing *Moody* requires.

**B**

Next up, vagueness. The district court held, and NetChoice contends before us, that SB 351's requirement that social-media platforms use "commercially reasonable" age-verification mechanisms renders the statute unconstitutionally vague.

The problem, as NetChoice candidly acknowledges, is that "the district court raised this issue sua sponte." Br. of Appellee at 24 n.4. NetChoice predicated its request for a preliminary injunction on the contention that the statutory term "[s]ocial medial platforms" in SB 351 was unconstitutionally vague. Mot. for Prelim. Inj. at 32–33, Dkt. No. 5-1. In particular, NetChoice emphasized that SB 351 applies to "[s]ocial media platforms," a category defined largely by what it excludes—namely, platforms whose "predominant or exclusive function" is, for example, email, online shopping, teleconferencing, or cloud storage. Ga. Code Ann. § 39-6-1(6).

NetChoice contended that because the phrase "predominant or exclusive function" is undefined, social media companies couldn't know in advance whether SB 351 covers them.

Bypassing that theory, and acting on its own initiative, the district court concluded that an altogether different term—"commercially reasonable"—rendered the statute unconstitutionally vague. Dist. Ct. Order at 43–44, June 26, 2025, Dkt. No. 34. In granting injunctive relief on a theory that NetChoice never pleaded, the district court erred. *See Clark v. Sweeney*, 607 U.S. 7, 9 (2025) (holding that courts "transgress[] the party-presentation principle" when "granting relief on a claim that [the plaintiff] never asserted and that [the defendant] never had the chance to address").[5]

**C**

Lastly, preemption. The district court held that NetChoice was likely to succeed on its claim that § 230 of the Communications Decency Act, 47 U.S.C. § 230, preempts the provision of SB 351 that

[5] NetChoice asserts (albeit only half-heartedly) that it adequately preserved the void-for-vagueness issue because it "challenged the Act's age-requirements and argued that its disparate application raises constitutional problems." Br. of Appellee at 24 n.4 (citing Mot. for Prelim. Inj. at 15, Dkt. No. 5-1). But in its preliminary-injunction motion, NetChoice argued that the fact that SB 351 required companies to use only "commercially reasonable" age-verification mechanisms didn't ameliorate First Amendment problems because even affordable age-verification mechanisms burdened protected speech. *See* Mot. for Prelim. Inj. at 15, Dkt. No. 5-1. That argument is simply too far afield from a void-for-vagueness challenge to qualify under any reasonable application of the party-presentation principle.

prohibits "[t]he display of any advertising in the minor account holder's account based on such minor account holder's personal information." Dist. Ct. Order at 45, June 26, 2025, Dkt. No. 34 (quoting Ga. Code Ann. § 39-6-3(1)).

Section 230 prohibits treating a social-media platform as "the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). According to the district court, § 230 preempts SB 351's advertising provision because the latter imposes "liability 'for decisions relating to the monitoring, screening, and deletion of content from its network—actions quintessentially related to a publisher's role.'" Dist. Ct. Order at 45, June 26, 2025, Dkt. No. 34 (quoting *A.B. v. Salesforce, Inc.*, 123 F.4th 788, 798 (5th Cir. 2024)). Respectfully, we disagree.

SB 351's advertising provision doesn't treat social-media platforms as publishers or speakers of information provided by others. Rather, it regulates how social-media platforms *themselves* act by forbidding them from targeting minors with ads based on personal information. This type of regulation falls outside § 230's ambit, which preempts laws that seek to hold social-media platforms "liable for information originating with a third-party user." *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir 2006) (citation modified).

Tellingly, we think, the Fifth Circuit—on whose precedent the district court relied for its preemption holding—agrees. That court has held that § 230 didn't preempt a state law that requires

platforms to verify the age of visitors to pornographic websites because the law imposed liability "purely based on whether plaintiffs comply with the statute, independently of whether the third-party speech that plaintiffs host harms anybody." *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 285 (5th Cir. 2024), *aff'd on other grounds* 606 U.S. 461. So too here: SB 351 imposes liability on social-media platforms for their own decisions, not the speech of others. A platform can comply with it by choosing not to use minors' personal information when targeting their accounts with ads—it needn't "withdraw, postpone or alter content." *Cf. Salesforce, Inc.*, 123 F.4th at 795 (citation modified).

**IV**

To recap, we hold that NetChoice (1) has associational standing to pursue the rights of its members but (2) has failed to demonstrate a likelihood of success on the merits of its claims. It has not carried the burden that accompanies its decision to mount a facial First Amendment challenge, nor has it shown that SB 351 is unconstitutionally vague or preempted by § 230. Given our disposition, we needn't address the merits of NetChoice's First Amendment claim or the remaining preliminary-injunction factors.

Accordingly, we **AFFIRM** the district court's determination that NetChoice has associational standing, **VACATE** the preliminary injunction, and **REMAND** to the district court for proceedings consistent with this opinion.